No. 22-12898-P

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

---

Darryl Stinski,

*Petitioner-Appellant*,

v.

Warden, GDCP,

*Respondent-Appellee*.

On Appeal from the United States District Court for the Southern District of
Georgia (Savannah Division)
No. 4:18-cv-66

---

### PETITIONER-APPELLANT'S OPENING BRIEF

---

Jeffrey A. Fuisz
Robert Grass
Lori B. Leskin (application for admission *forthcoming*)
Sheila S. Boston (application for admission *forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street, New York, NY 10019-9710
Tel:  212.836.8000

Richard K. Hines, V
Lucas A. Westby
NELSON MULLINS RILEY & SCARBOROUGH
Atlantic Station, 201 17th Street NW, Suite 1700, Atlanta, GA 30603
Tel:  404.322.6272

*Attorneys for Appellant Darryl Stinski*

**No. 22-12898-P**
**Darryl Stinski v. Warden, GDCP**

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certify that the following persons may have an interest in the outcome of this case:

Arnold & Porter Kaye Scholer LLP - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Baker, The Honorable R. Stan - United States District Judge for the Southern District of Georgia;

Bass, Jr., The Honorable James F. - Senior Judge for the Eastern Judicial Circuit of Georgia who presided during Mr. Stinski's trial;

Boston, Sheila S. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Brooks, Stephen M. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Burris, C. Kawezya - Counsel for Mr. Stinski during state postconviction proceeding;

Burton, Beth A. - Deputy Attorney General for the State of Georgia during state and federal postconviction proceedings;

Carr, Christopher M. - Attorney General for the State of Georgia during federal postconviction proceeding;

Chatman, Bruce - Former Warden at Georgia Diagnostic and Classification State Prison and defendant in state postconviction proceedings;

Dozier, Gregory C. - Former Commissioner of the Georgia Department of Corrections and defendant in federal postconviction proceedings;

Ford, Benjamin - Former Warden at Georgia Diagnostic and Classification State Prison and defendant in federal postconviction proceeding;

Fuisz, Jeffrey A. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Graham, Sabrina - Senior Assistant Attorney General for the State of Georgia during state and federal postconviction proceedings;

Grass, Robert M. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Hines, V, Richard K. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Humphrey, Carl - Former Warden at Georgia Diagnostic and Classification State Prison and defendant in state postconviction proceeding;

Iannuzzi, Kate - Assistant Attorney General for the State of Georgia during state postconviction proceeding;

Leskin, Lori B. - Counsel for Mr. Stinski during state and federal postconviction proceedings;

Lock, David T. - Chief Assistant District Attorney for the Eastern Judicial Circuit of Georgia during Mr. Smith's trial;

McConnell, Greg - Assistant District Attorney for the Eastern Judicial Circuit of Georgia during Mr. Smith's trial;

Nankali, Natasha - Counsel for Council of Superior Court Judges of Georgia in state postconviction proceeding;

Nelson Mullins Riley & Scarborough LLP - Counsel for Mr. Stinski during state and federal postconviction proceedings;

O'Kelley, Dorian - Co-defendant;

Olens, Samuel S. - Attorney General for the State of Georgia during state postconviction proceeding;

Pittman, Kimberly - victim;

Pittman, Susan - victim;

Schiavone, Michael - Trial counsel for Mr. Stinski;

Scott, John W. - Counsel for Mr. Stinski during state postconviction proceeding;

Sellers, Eric - Former Warden at Georgia Diagnostic and Classification State Prison and defendant in state postconviction proceeding;

Short, Jason - Counsel for Mr. Stinski during state postconviction proceeding;

Sizemore, Jr., The Honorable W. James - Judge for the Southwestern Judicial Circuit
of Georgia who presided at state postconviction proceeding;

Sparger, Steven - Trial counsel for Mr. Stinski;

Stinski, Darryl Scott - Petitioner-Appellant;

Upton, Stephen - Former Warden at Georgia Diagnostic and Classification State
Prison and defendant in state postconviction proceeding;

Watkins, Mitchell - Assistant Attorney General for the State of Georgia during state
postconviction proceeding;

Weinberger, Dana - Assistant Attorney General for the State of Georgia during state
postconviction proceeding;

Westby, Lucas A. - Counsel for Mr. Stinski during state and federal postconviction
proceedings;

Yancey, II, Willie T. - Trial counsel for Mr. Stinski

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Darryl Stinski respectfully submits that oral argument would assist the Court in resolving the important issue raised in this appeal, and requests oral argument under Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules. This is a capital case in which the death penalty has been imposed in violation of Petitioner's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF CITATIONS................................................................................ v

JURISDICTIONAL STATEMENT .................................................................. ix

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE ........................................................................ 2

     A.    Mr. Stinski's Trial Counsel Ignored Red Flags and Failed to Develop Critical Mental Health Mitigation Evidence.........................2

     B.    Mr. Stinski's State Court Habeas Proceedings ...................................6

     C.    Mr. Stinski's Federal Habeas Petition ...................................................7

SUMMARY OF THE ARGUMENT ..................................................................7

ARGUMENT.................................................................................................10

I.    THE INTERPLAY BETWEEN SECTION 2254(D)(2) AND SECTION 2254(E)(1)..........................................................................10

     A.    The District Court Erred by  Merging Subsections (d)(2) and (e)(1)...............................................................................................13

          1.    The Plain Language and Structure of 28 U.S.C. § 2254 Counsels Against A Merger of the Two Standards.................13

          2.    Settling the Interplay Between Sections 2254(d)(2) and (e)(1) Defines the Scope of the Record to be Reviewed and the Level of Deference Accorded to the State Court.........15

II.   THE DISTRICT COURT IMPROPERLY APPLIED THE CLEAR
      AND CONVINCING EVIDENCE BURDEN OF PROOF FOUND
      IN SECTION 2254(e)(1) ..........................................................................17

      A.   Applying Section 2254(d)(2), the State Court Unreasonably
           Determined that the Expert Evidence Was Cumulative ....................18

           1.   The State Court Unreasonably Determined That Trial
                Counsel's Failure to Retain Additional Experts Was Not
                Deficient .................................................................................19

           2.   The State Court Unreasonably Equated Petitioner's
                Social History with an Expert's Ability to "Connect the
                Dots" to Petitioner's Culpability at the Mitigation Phase ........23

      B.   Applying Section 2254(d)(2), the Habeas Court Unreasonably
           Determined that Failing to Seek Neuropsychological Expert
           Testimony Did Not Constitute Ineffective Assistance of
           Counsel...............................................................................................25

           1.   The District Court Improperly Found that Petitioner
                Could Not Challenge the Evidence of Whether Davis or
                Weilenman Raised the Issue of Another Expert with
                Counsel Under Section 2254(e)(1) ..........................................27

III.  THE DISTRICT COURT ALSO ERRED IN FINDING THAT THE
      STATE COURT'S PREJUDICE DETERMINATION WAS NOT
      BASED ON AN UNREASONABLE DETERMINATION OF THE
      FACTS .....................................................................................................33

      A.   Connecting Petitioner's Physical and Emotional Trauma to his
           Culpability Was Crucial to Mitigation ..............................................36

      B.   Dr. Joette James Conducted Rigorous Neuropsychological
           Testing................................................................................................39

      C.   Dr. Peter Ash Explained Hallmarks of Adolescent Crime in Mr.
           Stinski's Behavior the Night of the Crime..........................................41

      D.   Dr. James Garbarino Concluded Mr. Stinski Was An Untreated,
           Traumatized Child the Night of the Crime .........................................44

iii

E.     Connecting Petitioner's Physical and Emotional Trauma to his Culpability was Especially Important in Light of the Aggravating Factors ...........................................................46

CONCLUSION .........................................................................................50

CERTIFICATE OF COMPLIANCE.......................................................51

CERTIFICATE OF SERVICE................................................................52

iv

# TABLE OF CITATIONS

**Page(s)**

## **Cases**

*Abdul-Kabir v. Quarterman,*
   550 U.S. 233 (2007)...................................................35

*Andrus v. Texas,*
   140 S. Ct. 1875 (2020)..............................................34

*Atkins v. Virginia,*
   536 U.S. 304 (2002)..................................................29

*Bemore v. Chappell,*
   788 F.3d 1151 (9th Cir. 2015)..................................26

*Boyde v. California,*
   494 U.S. 370 (1990)..................................................47

*Burt v. Titlow,*
   571 U.S. 12 (2013 ....................................................11

*Colautti v. Franklin,*
   439 U.S. 379 (1979)..................................................14

*Consalvo v. Sec'y for Dep't of Corr.,*
   664 F.3d 842 (11th Cir. 2011)..............................17, 18

*Cooper v. Sec'y, Dep't of Corrs.,*
   646 F.3d 1328 (11th Cir. 2011)................................20

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000)..................................................14

*Ferrell v. Hall,*
   640 F.3d 1199 (11th Cir. 2011)........................34, 35, 47

*Hayes v. Sec'y, Fla. Dep't of Corr.,*
   10 F.4th 1203 (11th Cir. 2021)..............................12, 13

*Hooks v. Workman,
    689 F.3d 1148 (10th Cir. 2012) ................................................................*passim*

*Jefferson v. GDCP Warden,
    941 F.3d 452 (11th Cir. 2019) ................................................................*passim*

*Jones v. Ryan,
    No. 18-99005, -- F.4th --, 2022 WL 16731981 (9th Cir. Nov. 7,
    2022) ........................................................................................................*passim*

*Lambert v. Blackwell,
    387 F.3d 210 (3d Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005) ......... 14, 15, 16

*Lopez v. Att'y Gen.,
    845 F. App'x 549 (9th Cir. 2021) ..........................................................*passim*

*Maples v. Comm'r, Ala. Dep't of Corr.,
    729 F. App'x 817 (11th Cir. 2022) .........................................................*passim*

*Miller-el v. Cockrell,
    537 U.S. 322 (2003) ...............................................................................*passim*

*Miller-El v. Dretke,
    545 U.S. 231 (2005) .................................................................. 15, 16, 18, 25

O'Kelley v. State,
    670 S.E.2d 388 (Ga. 2008) .............................................................................2

Porter v. McCollum,
    558 U.S. 30 (2009) .................................................................................33, 35

*Pye v. Warden, Georgia Diagnostic Prison,
    50 F.4th 1025 (11th Cir. 2022) (en banc) ...................................... 11, 12, 33, 34

Roper v. Simmons,
    543 U.S. 551 (2005) ...................................................................................29

Stinski v. Georgia,
    562 U.S. 1011 (2010) ...................................................................................6

Stinski v. State,
    691 S.E.2d 854 (Ga. 2010) ........................................................................2, 6

*Strickland v. Washington*,
    466 U.S. 668 (1984)..............................................................*passim*

*\*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004), *cert. denied*, 543 U.S. 1038 (2004)........ 15, 16, 17

*Wiggins v. Smith*,
    539 U.S. 510 (2003)..........................................................25, 27, 32

*Williams v. Allen*,
    598 F.3d 778 (11th Cir. 2010)............................................................18

*Williams v. Taylor*,
    529 U.S. 362 (2000)............................................................................14

*Wood v. Allen*,
    558 U.S. 290 (2010)............................................................................11

## **Constitutional Provisions**

U.S. Const., amend. VI ............................................................i, ix, 8

U.S. Const., amend. XIV ..........................................................i, ix, 8

## **Statutes**

28 U.S.C. § 1291..........................................................................ix, x

28 U.S.C. § 1331............................................................................ix

28 U.S.C. § 2253(c) ...................................................................ix, x

28 U.S.C. § 2254......................................................................ix, 7, 13

28 U.S.C. § 2254(a) ......................................................................ix

*\*28 U.S.C. § 2254(d)(2)......................................................*passim*

*\*28 U.S.C. § 2254(e)(1)......................................................*passim*

28 U.S.C. § 2254(e)(2).................................................................16

## **Rules**

11th Cir. R. 28-1(c).......................................................................... i

Fed. R. App. P. 34(a)(1) ............................................................................. i

Fed. R. Civ. P. 59(e) ........................................................................... ix, 7

## **Other Authorities**

American Bar Association, Guidelines for the Appointment and
    Performance of Defense Counsel in Death Penalty Cases, Revised
    Edition, reprinted in 31 Hofstra L. Rev. 913, 956 (2003) ...........................20, 21

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253(c).  Petitioner filed a petition for a writ of habeas corpus in the Superior Court of Butts County on September 12, 2011, and an amended petition on March 21, 2013.  DE 11-19; DE 12-24.  Among other claims, Mr. Stinski asserted that his conviction and sentence were obtained in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution because his trial attorneys rendered ineffective assistance.  By order dated January 15, 2017 and filed January 20, 2017, the superior court denied Mr. Stinski's habeas petition. *See* DE 27-20. On February 5, 2018, the Georgia Supreme Court denied Mr. Stinski's application for a certificate of probable cause.  *See* DE 27-24.

On March 26, 2018, Mr. Stinski filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Georgia.  In his petition, Mr. Stinski asserted his claim for ineffective assistance of counsel.  *See* DE 1.  The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 2254(a).  The district court entered a judgment denying each of Mr. Stinski's claims on December 15, 2021.  DE 72.  On January 14, 2022, Mr. Stinski moved under Fed. R. Civ. P. 59(e) to alter or amend the judgment.  DE 74.  On July 28, 2022, the district court granted in part Mr. Stinski's motion and granted him a certificate of appealability "on the issue of whether it was proper for

the Court to apply [s]ection 2254(d)(2)'s deference to the state habeas court's decision but apply [s]ection 2254(e)(1)'s deference to the state habeas court's individual findings of fact." DE 75 at 31. On August 29, 2022, Mr. Stinski filed a notice of appeal. DE 76. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253(c).

## STATEMENT OF THE ISSUES

Petitioner-Appellant, Darryl Stinski provides the following statement of the issue to be presented on appeal:

Did the district court improperly merge 28 U.S.C. § 2254(d)(2) and § 2254(e)(1) when evaluating whether the state court decision denying Petitioner's ineffective assistance of counsel claim was based on an unreasonable determination of the facts?

## STATEMENT OF THE CASE

### A.    Mr. Stinski's Trial Counsel Ignored Red Flags and Failed to Develop Critical Mental Health Mitigation Evidence

Petitioner-Appellant Darryl Scott Stinski was eighteen years and nine months old when Dorian O'Kelley, his codefendant, made him complicit in the murders of Susan and Kimberly Pittman in April 2002.  DE27-20 at 88.  On June 5, 2002, Mr. Stinski and Mr. O'Kelley were indicted on two counts of malice murder and related charges.  *See Stinski v. State*, 691 S.E.2d 854, 862 n.1 (Ga. 2010); *O'Kelley v. State*, 670 S.E.2d 388, 392 n.* (Ga. 2008).  Mr. O'Kelley was tried separately and convicted on two counts of malice murder and related charges.  *See O'Kelley*, 670 S.E.2d at 392 n.*.

During his entire life up to the night of the crimes, Mr. Stinski had suffered "pervasive, chronic psychological maltreatment"—he was abused by his father and stepfather in early childhood, abandoned by his mother and rejected by his older brother, leaving him with "no sense of home" as he struggled for stability with respect to both his emotional and physical safety.  DE 13-21 at 1339:3–18, 1340:3–10, 1342:12–22, 1367:5, 1411:4–16; DE 13-17 at 446:3–6; DE 10-11 at 2810:7–13.  Mr. Stinski's history of abuse and neglect exacerbated his deficits in executive functioning skills, which include organization, planning, and the ability to revise an action plan.  DE 13-20 at 1187:6–1191:19, 1214:2–1215:2, 1217:14–1220:9, 1227:4–1229:4.  Coupled, the two left Mr. Stinski functioning at the level of "an

2

untreated, traumatized child" desperate to fit in at the time of the crimes. DE 13-21 at 1411:4–16. He was particularly vulnerable to Mr. O'Kelley's dangerous influence, *see id.*, and his condition compromised his ability to reason, respond appropriately, or extricate himself from the situation when he and Mr. O'Kelley were in the Pittman home. DE 13-20 at 1220:10–1221:8.

The trial court appointed three attorneys to represent Mr. Stinski at trial: Michael Schiavone (the lead attorney), Steven Sparger, and Willie Yancey. DE 13-15 at 26:4–7, 29:22–30:5. They retained Dale Davis, a social worker and mitigation investigator, and Dr. Jane Weilenman, a clinical psychologist, to assist with Mr. Stinski's mitigation defense. *Id.* at 46:6–47:8, 88:17–25, 147:16–148:24. However, trial counsel ignored glaring red flags with respect to Mr. Stinski's significant developmental issues, immaturity and mental health problems which warranted further investigation for use in mitigation. *See id.* at 160:11–161:5*; DE 13-16 at 389:3–390:1; DE 13-19 at 818:14–24*.

Ms. Davis attempted to raise the alarm "time after time," DE 13-19 at 831:15–18, including on December 3, 2004, when she sent Mr. Sparger an email with resources regarding adolescent brain development issues and advised that the developmental issues "are very apparent in Darryl's case" and "his immaturity and mental health problems make this especially relevant." DE 19-9 at 38346–47. Ms. Davis further wrote that "I'm not sure what experts have seen him other than Jane

3

[Weilenman] but *we probably need a specialist in that field to explain the impulsiveness, lack of judgment, etc.*" and included a recommendation for an expert in adolescent brain development that had appeared on a listserv for sentencing advocates. *Id.* (emphasis added).

In January 2005—over two years before Mr. Stinski's trial—the defense team, including Messrs. Sparger and Schiavone and Ms. Davis and Dr. Weilenman, convened at Jackson & Schiavone's office to strategize about the mitigation case. At that meeting, all the participants agreed with Ms. Davis's recommendation that Darryl "needed to have a neuropsychological exam" to assess the potential developmental issues and how those issues relate to "Darryl's background" and that the defense team "need[ed] to have someone testify to bring all of these things in and to show the impact, not just the factual information that we had developed, but what it means and how it impacts somebody." DE 13–19 at 835:7–837:5. The defense team identified Dr. Jeffrey Arnett as a candidate to fill that role and "Dr. Weilenman was going to contact a neuropsychologist she knew, and that was where it was left." *Id.* at 835:7–20; DE 23-21 at 70747; DE 71 at 19. But, Mr. Sparger failed to follow up with Ms. Davis or Dr. Weilenman after the January 2005 meeting, and never retained Dr. Arnett or another neuropsychologist. *See* DE 13-15 at 156:21–157:4, 161:6–22; DE 13-19 at 909:1–913:9.

Mere weeks before trial, Mr. Schiavone assigned Mr. Sparger, who had never conducted the sentencing phase of a capital trial, to take full responsibility for Petitioner's mitigation case.  DE 13-15 at 62:15–63:1, 157:24–158:5; *see also id.* at 31:4–6, 38:7–11.  Mr. Sparger confessed his feelings of anxiety, inadequacy, and fear surrounding the mitigation case to Gail Rudolph, a therapist who had treated Mr. Stinski as a teenager.  DE 13-18 at 711:19–712:19.  Mr. Sparger then failed to prepare mitigation witnesses, and found himself "lost" by the time he had witnesses on the stand during the sentencing phase of Mr. Stinski's trial following his capital murder conviction.  *See* DE 13-15 at 174:11–25, 175:9–180:16; DE 13-16 at 278:18–20, 278:9–11.

One such witness was Dr. Weilenman, whom Mr. Sparger prepared just one day before her testimony.  DE 13-15 at 205:16–20.  She presented Mr. Stinski's "social history" to the jury, but did not do any testing, offer any diagnoses, or discuss Mr. Stinski's level of culpability in the crimes.  *See* DE 10-11 at 2769:18, 2770:16–20, 2830:23–25, 2838:16–18, 2838:16–18.  As a result, the jury was deprived of any explanation as to why it should view Mr. Stinski as an adolescent at the time of the crimes, less culpable than an adult, and not among the worst offenders for whom the death penalty is reserved.  On June 13, 2007, Mr. Stinski was sentenced to death. DE 10-11 at 2971:19–25.

On March 1, 2010, the Georgia Supreme Court affirmed his conviction and sentence. *See Stinski*, 691 S.E.2d at 862. On November 1, 2010, the United States Supreme Court denied Mr. Stinski's petition for a writ of certiorari. *See Stinski v. Georgia*, 562 U.S. 1011 (2010).

### B.    Mr. Stinski's State Court Habeas Proceedings

Mr. Stinski filed a petition for a writ of habeas corpus in the Superior Court of Butts County on September 12, 2011, and an amended petition on March 21, 2013. DE 11-19; DE 12-24. Among other claims, Mr. Stinski alleged that his trial counsel rendered ineffective assistance during the sentencing phase of his capital trial. The superior court held an evidentiary hearing from August 12 through August 15, 2013. The court admitted 161 exhibits, and twenty witnesses testified, including three experts: a clinical neuropsychologist, Dr. Joette James, DE 13-20 at 1150–1265; an expert in forensic psychiatry, Dr. Peter Ash, DE 13-17 at 417–580; and an expert in developmental psychology and trauma, Dr. James Garbarino, DE 13-21 at 1322–1467.

By order dated January 15, 2017 and filed January 20, 2017, the superior court denied Petitioner's habeas petition. *See* DE 27-20. On February 5, 2018, the Georgia Supreme Court denied Mr. Stinski's application for a certificate of probable cause. *See* DE 27-24.

6

### C.     Mr. Stinski's Federal Habeas Petition

On March 26, 2018, Mr. Stinski petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Georgia, asserting his claim for ineffective assistance of counsel, among others.  *See* DE 1.  On December 15, 2021, the district court denied Mr. Stinski's petition for a writ of habeas corpus and denied Petitioner a certificate of appealability.  DE 72 at 79.  Among other things, the district court held that Mr. Stinski failed to show that the state court decision denying Mr. Stinski's ineffective assistance of counsel claim was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  DE 75 at 21.  Mr. Stinski moved to alter or amend the judgment under Fed. R. Civ. P. 59(e) on January 14, 2022.  DE 74.  On July 28, 2022, the district court granted a certificate of appealability on the issue of "whether the Court properly applied [s]ections 2254(d)(2) and 2254(e)(1) of the [Antiterrorism and Effective Death Penalty Act ("AEDPA")] in the Habeas Order when evaluating Petitioner's ineffective assistance of counsel claim."  DE 75 at 1–2.  Petitioner filed a notice of appeal on August 29, 2022.  DE 76.

## SUMMARY OF THE ARGUMENT

Mr. Stinski's sentencing jury did not hear critical evidence because his trial counsel unreasonably neglected their duty to "explain to the jury why [Mr. Stinski] may have acted as he did—[to] connect the dots between, on the one hand, [his]

7

mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question" even though such evidence was readily available. *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012). Despite the defense team's unanimous conclusion that Mr. Stinski would be convicted of capital murder, the lead and most experienced attorney assigned the most important phase of the trial—the sentencing phase—to the least experienced attorney who had never presented evidence to a jury at a capital trial. The predictable result was that the inexperienced attorney was overwhelmed, and his mitigation presentation was disorganized, incoherent and incomplete. Most significantly, Mr. Stinski's defense team—and specifically its least experienced member—failed to follow through on their observations of Mr. Stinski's developmental and mental health issues that should have been a central part of his mitigation case. As a result, counsel was constitutionally ineffective and Mr. Stinski was prejudiced in violation of his Sixth and Fourteenth Amendment rights under the U.S. Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984).

Both the state habeas court and district court agreed that "Petitioner's scientific evidence was persuasive" and "compelling" and "that trial counsel did not present the type of scientific evidence offered by Petitioner in this proceeding to 'connect the dots' between Petitioner's conduct and his adolescence." DE 27-20 at 4–5; *see also* DE 72 at 27. Nevertheless, the habeas court determined that the

testimony of Drs. James, Ash, and Garbarino was cumulative to the social history evidence presented by Dr. Weilenman.  Finding the new expert evidence as adding little of value, the habeas court and the district court did not properly reweigh the totality of mitigating evidence, against the aggravating circumstances in this case.

In finding that the habeas court's determination was not unreasonable, the district court concluded that Mr. Stinski had not rebutted the state court's factual determinations by "clear and convincing" evidence, citing to 28 U.S.C. section 2254(e)(1) and section 2254(d)(2).  But, as noted by the Supreme Court in *Miller-el v. Cockrell*, 537 U.S. 322, 341–42 (2003) ("*Miller-El I*"), such merger of those two distinct provisions is "too demanding" of habeas petitioners.

The plain language and structure of the statute, along with the purpose of AEDPA, mandates that section 2254(d)(2) constitutes a standard of review requiring a habeas applicant to show that the state court decision was an objectively unreasonable determination of the facts in light of the totality of the evidence adduced in the state court trial and habeas proceeding.  On the other hand, section 2254(e)(1) constitutes a burden of proof that applies after a petitioner overcomes the section 2254(d)(2) bar and if the district court considers evidence outside the state court record, which did not happen here.

It was error for the district court to require Mr. Stinski to rebut state court fact determinations by clear and convincing evidence to overcome the bar to relief in

9

section 2254(d)(2).  Had the district court applied section 2254(d)(2) properly, the district court would have found that the state court decision was an unreasonable determination of the facts based on the evidence in the state court record and that Mr. Stinski's trial counsel rendered Constitutionally ineffective assistance to Mr. Stinski, which prejudiced him.

This Court should reverse and remand to the district court with instructions to apply the appropriate standard.

## ARGUMENT

### I.    THE INTERPLAY BETWEEN SECTION 2254(D)(2) AND SECTION 2254(E)(1)

Two distinct sections of AEDPA govern the deference that a federal habeas court must give to a state court's factual determinations.  Under section 2254(d)(2), a federal court may grant a writ of habeas corpus where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In other words, the state court decision "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  *Miller-El I*, 537 U.S. at 340.  Separately, under section 2254(e)(1) the State court's factual determinations "shall be presumed to be correct" absent "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

10

As the district court noted, "the Supreme Court has 'not defined the precise relationship between [section] 2254(d)(2) and [section] 2254(e)(1).'" DE 75 at 26 (citing *Burt v. Titlow*, 571 U.S. 12, 18 (2013)).[1]  The Eleventh Circuit recently addressed one aspect of the "interplay" between section 2254(d)(2) and (e)(1) in *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc).  In *Pye*, the Court explained that "even if a petitioner successfully carries his burden under [section] 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under section 2254(d)(2):  Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' *Id.* § 2254(d)(2)." *Id.* at 1035.  Thus, if a petitioner demonstrates that the state court made a clearly erroneous

---

[1] The Supreme Court has granted certiorari to resolve the proper application of those AEDPA sections twice, but on both occasions declined to resolve the issue. *See Wood v. Allen*, 558 U.S. 290, 300 (2010) ("Although we granted certiorari to resolve the question of how [sections] 2254(d)(2) and (e)(1) fit together, we find once more that we need not reach this question . . ."); *Miller-El I*, 537 U.S. at 341 ("It was incorrect for the Court of Appeals, when looking at the merits, to merge the independent requirements of [sections] 2254(d)(2) and (e)(1)" because "[t]he clear and convincing evidence standard is found in [section] 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

factual determination, "[d]epending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable . . . ." *Id.*

Critically, for this appeal, the *Pye* Court did not address, much less hold, that a petitioner must always show by clear and convincing evidence that factual findings were erroneous under section 2254(e)(1) as a prerequisite to demonstrating that a "decision" was "based on" an "unreasonable determination of the facts" under section 2254(d)(2). Nor, could the Court have concluded that given the Supreme Court's holding in *Miller-El I*. In *Miller-El I*, the Supreme Court held that a Court of Appeals applied "too demanding a standard" when it "require[ed] petitioner to prove that the state-court decision was objectively unreasonable by clear and convincing evidence." *Miller-El I*, 537 U.S. at 341. The Court explained "[i]t was incorrect for the Court of Appeals, when looking at the merits, to merge the independent requirements of [sections] 2254(d)(2) and (e)(1)" because "[t]he clear and convincing evidence standard is found in [section] 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions." *Id.*

Thus, the interplay of these sections remains an open question in this Circuit where, as here, Mr. Stinski's position is that the state court's decision was based on an unreasonable determination of the facts in light of all the evidence in the state court record. *See Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1223 (11th Cir.

2021) (Newsom, J., concurring) ("precisely how subsections (d)(2) and (e)(1) relate to one another has remained an open question").  Circuits remain split "over the exact relationship between subsections (d)(2) and (e)(1)."  *Id.* (collecting cases); *see generally* Bryan R. Means, Federal Habeas Manual § 3:82 (2022).

## A.    The District Court Erred by  Merging Subsections (d)(2) and (e)(1)

### 1.    *The Plain Language and Structure of 28 U.S.C. § 2254 Counsels Against A Merger of the Two Standards*

Under section 2254(d)(2), a habeas petitioner need only show that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.  **First**, the plain language of section 2254(d)(2) and section 2254(e)(1) confirm that the provisions offer two different standards of review for two distinct functions of a federal habeas court. Section (e)(1) specifies that a state court determination of a factual issue is "presumed to be correct" and that a federal habeas petitioner must rebut that "presumption of correctness" by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  In contrast, section (d)(2) requires the federal court to assess whether the state court decision was based on an "unreasonable" determination of the facts— not whether the facts were correctly determined.  *Id.* at § 2254(d)(2).

Had Congress intended the (e)(1) clear and convincing burden of proof to govern the (d)(2) standard of review for reasonableness, rather than place it in subsection (e) with the standard for determining whether an evidentiary hearing in

federal court is permitted, it would have added that provision to subsection (d). Alternatively, Congress could have written (e)(1) in terms of rebutting a presumption of reasonableness, rather than rebutting a presumption of correctness. Congress did neither. To overlay the two standards would be "too demanding" a burden on the petitioner. *Miller-El I*, 537 U.S. at 341. This Court should not disregard Congressional intent by improperly merging the requirements of those independent subsections.

**Second**, principles of statutory interpretation dictate that the two provisions be given full, independent effect. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (citations omitted)). *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (courts must "give effect, if possible, to every clause and word of a statute" (citations omitted)); *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (rejecting construction that would render provision "redundant or largely superfluous, in violation of the elementary canon . . . that a statute should be interpreted so as not to render one part inoperative"). Congress placed section 2254(d)(2) and section 2254(e)(1) in separate subsections, demonstrating an intention for the sections to operate independently. *See Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004) ("We . . . read [section] 2254(d)(2) and [section]

14

2254(e)(1) together as addressing two somewhat different inquiries" because "it is a cardinal rule of statutory interpretation that we must 'give effect, if possible, to every clause and word of a statute.'" (citation omitted)), *cert. denied*, 544 U.S. 1063 (2005); *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("We interpret these provisions sensibly, faithful to their text and consistent with the maxim that we must construe statutory language so as to avoid contradiction or redundancy"), *cert. denied*, 543 U.S. 1038 (2004).

> **2.    Settling the Interplay Between Sections 2254(d)(2) and (e)(1) Defines the Scope of the Record to be Reviewed and the Level of Deference Accorded to the State Court**

Consistent with that principle of statutory construction, a federal habeas court making a reasonableness determination under section 2254(d)(2) must consider the "totality of the 'evidence presented in the state-court proceeding.'" *Lambert*, 387 F.3d at 235; *Taylor*, 366 F.3d at 999. Such "intrinsic challenge[s]" are "governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." *Taylor*, 366 F.3d at 1000. For example, in *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005) ("*Miller-El II*"), the Supreme Court held that the state court's decision was based on an unreasonable determination of the facts, although "at some points the significance of [the petitioner's] evidence [was] open to judgment calls." Miller-El sought habeas relief because the prosecution discriminatorily used peremptory strikes to exclude Black jurors from the venire. *Id.* at 236–237. The

15

Supreme Court reasoned that the evidence, when "viewed cumulatively," was "too powerful to conclude anything but discrimination." *Id.* at 265.

In contrast, section 2254(e)(1) precedes section 2254(e)(2), which governs whether a reviewing court should hold a separate evidentiary hearing on the habeas claim. Under section 2254(e)(2), a federal habeas court may hold an evidentiary hearing and consider new evidence only when a petitioner has exercised due diligence in pursuing his claims in state court and been deprived of the opportunity to obtain and present the evidence in state court, or when the Supreme Court has set forth a new rule of constitutional law that retroactively applies to cases on collateral review. 28 U.S.C. § 2254(e)(2). Using the same principle of statutory interpretation, section 2254(e)(1) "comes into play" where a petitioner seeks to "attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision." *Lambert*, 387 F.3d at 235; *see also id.* ("the language of [section] 2254(d)(2) and [section] 2254(e)(1) implies an important distinction . . . . [section] 2254(e)(1) contemplates a challenge to the state court's individual factual determinations, including a challenge based wholly or in part on evidence outside the state trial record"). When section 2254(e)(1) is applied, the federal court accords the state court's findings a presumption of correctness against "any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court." *Taylor*, 366 F.3d at 1000. When evidence is extrinsic, it must "amount[] to clear

16

and convincing proof that the state-court finding is in error." *Id.* Thus, extrinsic

challenges under section 2254(e)(1) must therefore meet a higher threshold of proof

than intrinsic challenges under section 2254(d)(2).[2]

## II.    THE DISTRICT COURT IMPROPERLY APPLIED THE CLEAR AND CONVINCING EVIDENCE BURDEN OF PROOF FOUND IN SECTION 2254(E)(1)

In denying Petitioner habeas relief, the state court concluded and the district

court agreed that Mr. Stinski's trial counsel conducted an "'extensive mitigation

investigation and hired two experts,'" Ms. Davis and Dr. Weilenman.  DE 75 at 8

(quoting DE 72 at 23).   The district court rejected Petitioner's claim that trial

counsel's mitigation investigation was inadequate because they failed to engage

additional experts with the same expertise as Drs. James, Ash, and Garbarino.  *Id.* at

10–11 (citing DE 72 at 25).   In doing so, the district court cited the state court's

finding that Dr. Weilenman "did not recommend further testing."  *Id.* at 10; DE 72

at 35 (citing DE 27-20 at 38).   The district court stated that "contradictory testimony"

that Dr. Weilenman and Mr. Sparger discussed the need to retain additional experts

was "not enough to overcome the 'presumption of correctness' afforded to a 'factual

determination made by a state court' under the AEDPA, which requires 'clear and

convincing evidence.'"  DE 75 at 11, 13-14 (quoting *Consalvo v. Sec'y for Dep't of*

---

[2] A contrary interpretation would abdicate the Court's judicial review function under AEDPA.   *See Miller-El I*, 537 U.S. at 340 ("[D]eference does not imply abandonment or abdication of judicial review.").

*Corr.*, 664 F.3d 842, 845 (11th Cir. 2011)).  The district court further reasoned that "in addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference . . . . Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an objectively unreasonable manner."  DE 72 at 20 (citing *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010)).

The district court's application of the standards in section 2254(d)(2) and 2254(e)(1) is exactly the improper merger of those provisions that the Supreme Court rejected as "too demanding" in *Miller-El I*, 537 U.S. at 341.  Mr. Stinski presented no new evidence to the district court that would have warranted application of the clear and convincing burden of proof in section 2254(e)(1).  Instead, the relevant inquiry under section 2254(d)(2) is whether, based on the totality of the evidence Mr. Stinski presented in the state court, the state court's rejection of Mr. Stinski's ineffective assistance of counsel claim was based on an unreasonable determination of the facts.  In this inquiry, the court must weigh all evidence, even if "at some points the significance of [Mr. Stinski's] evidence [was] open to judgment calls."  *Miller-El II*, 545 U.S. at 265.

## A. Applying Section 2254(d)(2), the State Court Unreasonably Determined that the Expert Evidence Was Cumulative

A state court decision may be based on an unreasonable determination of the facts "where the state courts plainly misapprehend . . . the record in making their

findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim." *Jones v. Ryan*, No. 18-99005, -- F.4th --, 2022 WL 16731981, at *12 (9th Cir. Nov. 7, 2022) (state court wrongly concluded that "neuropsychological testing was not warranted" and that counsel was effective, despite failure to seek such testing); *Jefferson v. GDCP Warden*, 941 F.3d 452, 456 (11th Cir. 2019) ("in light of the substantial [neuropsychological] evidence" that petitioner's brain damage affected his conduct at the time of the killing, counsel's deficient performance prejudiced petitioner). Here, the state court misapprehended the record in concluding that Drs. Ash, Garbarino, and James's testimony was unnecessary and cumulative, demonstrating that the state court decision denying Mr. Stinski's ineffective assistance of counsel claim was based on an unreasonable determination of the facts. DE 72 at 21–22 (quoting DE 27-20 at 5, 35–39); *see also* DE 27-20 at 81–82.

### 1. *The State Court Unreasonably Determined That Trial Counsel's Failure to Retain Additional Experts Was Not Deficient*

Under *Strickland*, a petitioner must establish that "his lawyer's actions fell below an objectively reasonable standard of performance." *Jefferson*, 941 F.3d at 477. In holding that Mr. Stinski's trial counsel had not been deficient, the state court determined that "Petitioner's scientific evidence . . . was cumulative" of Ms. Davis's and Dr. Weilenman's testimony, which, according to the district court, described

19

Mr. Stinski's social history and mental health. DE 75 at 6, 24–25. But evidence is not cumulative just because it relates to the same subject matter. *Cooper v. Sec'y, Dep't of Corrs.*, 646 F.3d 1328, 1353 (11th Cir. 2011) (holding that state court "finding that the mitigation evidence presented at the evidentiary hearing was cumulative to that presented at sentencing was an unreasonable determination of the facts" where trial testimony that petitioner's father "'was both violent and emotionally abusive' . . . did not begin to describe the horrible abuse testified to" during the habeas proceedings). The "quality of the mitigation evidence" matters. *See Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817, 827 (11th Cir. 2022).

In particular, in capital cases, neuropsychological diagnoses are well-established mitigation evidence. *See Jefferson*, 941 F.3d at 486 (evidence that petitioner suffered from brain damage and had difficulties controlling behavior "bears directly on [petitioner]'s moral culpability and appreciably weakens whatever reasons the jury had for imposing a death sentence"). In many capital cases, mental health experts are essential. *See* American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, reprinted in 31 Hofstra L. Rev. 913, 956 (2003) ("ABA Guidelines") (Commentary to § 4.1) ("[M]ental health experts are essential to defending capital cases."); *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in

American Bar Association standards and the like . . . are guides to determining what is reasonable.").

Here, the testimony of Drs. Ash, Garbarino, and James "connect[ed] the dots between, on the one hand, [Mr. Stinski's] mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Hooks*, 689 F.3d at 1204; *see also Lopez v. Att'y Gen.*, 845 F. App'x 549, 552 (9th Cir. 2021) (state court should have considered trial counsel's failure to introduce an expert psychological opinion "connecting [the petitioner's] actions to his difficult childhood . . . giving credence to the fact that he committed the crime impulsively").

By her own description, Dr. Weilenman presented no more than a "social history" in which she recited facts concerning Petitioner's upbringing. *See* pp. 39–40, *infra*. As Dr. Garbarino testified, a social history is a tool necessary to provide a foundation for a proper psychological analysis—not an end in itself. DE 13-21 at 1349:23–1351:13, 1354:5–9. Dr. Weilenman "had a certain amount of facts, and they presented a social history, but what was lacking was an organizing higher-order concept to . . . highlight and make sense out of the significance of those facts." *Id.* at 1411:17–1413:7; *see also id.* at 1427:14–1429:1.

Unlike Dr. Weilenman's social history testimony, Drs. Ash, Garbarino, and James provided expert testimony that explained why Mr. Stinski's: (1) preexisting deficits in executive functioning hindered his ability to adapt and think of alternative

21

behaviors in the Pittman home; (2) history of abuse left him vulnerable to peer pressure and manipulation by Dorian O'Kelley and unable to extricate himself from the situation in the Pittman home; and (3) mental deficiencies rendered him less culpable than the worst offenders who deserve the death penalty.[3]  *See also* DE 27-20 at 4–5 (Petitioner "presented compelling scientific evidence . . . that Petitioner's impulsive behavior and susceptibility to the influence of his codefendant was related to the lack of development of Petitioner's near adolescent brain").

Moreover, the state court's determination that expert testimony of Drs. James, Ash and Garbarino was cumulative of Dr. Weilenman's trial testimony is irreconcilably at odds with several findings in its ultimate decision.  The state court admitted that "Petitioner's scientific evidence was persuasive" and "compelling" and "that trial counsel did not present the type of scientific evidence offered by Petitioner in this proceeding to 'connect the dots' between Petitioner's conduct and his adolescence."  DE 27-20 at 4–5.  The state court further found that the testimony of Drs. James, Ash and Garbarino was a different "type of scientific" evidence than Dr. Weilenman's trial testimony.  *Id.* at 5.  The state court's conclusion that the testimony of Drs. James, Ash, and Garbarino was cumulative, despite findings that their testimony was persuasive, compelling, and distinct from the evidence presented

---

[3] *See also* Section III, *infra*.

by trial counsel, constituted an unreasonable determination and misapprehension of the facts.[4]

### 2. The State Court Unreasonably Equated Petitioner's Social History with an Expert's Ability to "Connect the Dots" to Petitioner's Culpability at the Mitigation Phase

At bottom, the social history that Ms. Davis and Dr. Weilenman provided was a predicate—not a substitute—for the "compelling scientific evidence" that was not presented. Ms. Davis is a social worker with no psychological or developmental background; Dr. Weilenman is a clinical psychologist. Neither provided the clinical neuropsychology, forensic psychiatry, or developmental psychology expertise offered by Drs. Ash, Garbarino, and James.[5] *See Jefferson*, 941 F.3d at 486 (counsel rendered ineffective assistance in "ignor[ing] the . . . recommendation of their retained psychologist that a neuropsychological evaluation be conducted"); *Jones*, 2022 WL 16731981, at *11 (trial expert's "evaluation and opinions were limited in that he was a psychiatrist not trained in matters involving organic brain function— information that a neuropsychologist could have developed and presented").

The mere fact that "Dr. Weilenman testified that Petitioner 'was still more into peer pressure than you would have expected at that age' and . . . 'needed to fit

---

[4] *See also* Section III, *infra*.

[5] Section III.B-D (comparing credentials and expertise of Dr. Weilenman, Ash, Garbarino, and James); *see also* Section II.B.1, *infra* (discussing testimony and evidence showing Mr. Stinski's defense team knew that the mitigation case required expertise that Dr. Weilenman did not possess).

in'" is not a substitute for having a scientific basis to opine on Petitioner's mental health and development and does not replace connecting the dots to his culpability as an adolescent. DE 72 at 29 (quoting DE 10-11 at 60–61). The district court dismissed the testimony of Drs. Garbarino and Dr. Ash as cumulative—merely "better explanation[s]," "more detail[s]," and "more scientifically founded" explanations of Dr. Weilenman's conclusions. *Id.* at 30. Similarly, the district court discounted Dr. Ash's testimony as only "*possibly* more convincing" although "more rooted in science . . . than Dr. Weilenman's testimony." *Id.*

But those details, scientific foundations, and explanations are precisely the dots that Dr. Weilenman's testimony failed to connect between Mr. Stinski's mental health deficiencies and his conduct in the Pittman home. Precisely the "explanation" that Mr. Sparger admitted was "missing" from his presentation. DE 13-16 at 305:11–306:3 ("[W]e put it out there about the lesser culpability, . . . but the jury never had the reason why, . . . an explanation."). *See Jones*, 2022 WL 16731981, at *5 (court unreasonably determined that trial expert "did a good job" and that "there was no reason to believe" that another expert "would have been any different"); *Maples*, 729 F. App'x at 827 (evidence offered by trial counsel "merely scratched the surface of the kind of trauma Maples suffered"); *Lopez*, 845 F. App'x at 552–54 (additional expert would have drawn "key causal connections"); *Hooks*, 689 F.3d at 1204 (additional expert would have "connect[ed] the dots" between diagnosis and

24

circumstances of crime). "Had counsel secured" experts such as Drs. Ash, Garbarino, and James, they "could have provided substantial evidence—through neuropsychological testing or otherwise—that [the defendant] suffered from mental illness" and explained to the sentencing jury why Mr. Stinski acted or failed to act like he did. *Jones*, 2022 WL 16731981, at *15.

B.   **Applying Section 2254(d)(2), the Habeas Court Unreasonably Determined that Failing to Seek Neuropsychological Expert Testimony Did Not Constitute Ineffective Assistance of Counsel**

Under, section 2254(d)(2), the evidence, when "viewed cumulatively," *Miller-El II*, 545 U.S. at 265, demonstrates that Mr. Stinski's trial counsel was on notice that additional experts were required but neglected to investigate further, taking actions that "fell below an objectively reasonable standard of performance." *Jefferson*, 941 F.3d at 477. In assessing the reasonableness of Mr. Sparger's and Mr. Schiavone's actions, the habeas court should have considered "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003). The critical inquiry is whether their decision not to seek additional neuroscientific evidence was reasonable, given the notice counsel received, from either Ms. Davis or Dr. Weilenman or their interactions with Petitioner, that neuropsychological testing was necessary and the knowledge that the sentencing phase was critical because a capital murder conviction in the guilt phase was a near

25

certainty. *Jefferson*, 941 F.3d at 477 (holding trial lawyer's performance fell beneath objective standard of reasonableness where trial lawyer "inexplicably ignored the . . . recommendation of their retained psychologist to seek further neuropsychological evaluation"); *Jones*, 2022 WL 16731981, at *10 (evidence that a defendant was mentally impaired "would have led a reasonable attorney to investigate further"). The state court record reveals no strategic reasons for trial counsel's decision, and neither the state court nor the district court point to one.  But "[s]uch performance is deficient because '[a]t the penalty phase, counsel's duty to follow up on indicia of mental impairment is quite different from—and much broader and less contingent than—the more confined guilt-phase responsibility.'"  *Jones*, 2022 WL 16731981, at *9 (quoting *Bemore v. Chappell*, 788 F.3d 1151, 1171 (9th Cir. 2015)).

Petitioner's trial counsel acted unreasonably when they failed to pursue "persuasive" and "compelling scientific evidence which could have been [but was not] presented at trial to demonstrate that Petitioner's impulsive behavior and susceptibility to the influence of his codefendant was related to the lack of development of [his] near adolescent brain" and "to 'connect the dots' between Petitioner's conduct and his adolescence."  DE 27-20 at 4–5.  Trial counsel knew of Mr. Stinski's developmental and mental health issues and their potential to mitigate his crimes, including that they "may lead to some sort of testing that would go somewhere."  DE 13-15 at 160:11–161:3.  As a result of neglect—not reasonable

26

trial strategy—trial counsel retained no such experts and failed to provide Mr. Stinski's sentencing jury with critical information necessary to "the jury's appraisal of [Petitioner's] moral culpability." *Wiggins*, 539 U.S. at 538; *Jefferson*, 941 F.3d at 478 ("If . . . failure to engage in further investigation was the result of neglect or oversight, no presumption of reasonableness attaches. . . .").

### 1.    *The District Court Improperly Found that Petitioner Could Not Challenge the Evidence of Whether Davis or Weilenman Raised the Issue of Another Expert with Counsel Under Section 2254(e)(1)*

In concluding that Mr. Stinski's trial counsel had not been deficient, the district court noted that Mr. Stinski's evidence "at best, reveals contradictory evidence regarding whether Dr. Weilenman and Sparger discussed the need to retain *additional experts* to perform testing on Petitioner that Dr. Weilenman could not perform herself." DE 72 at 26; *see also* DE 75 at 11. The district court further noted that "[s]uch contradictory testimony [was] not enough" to rebut the state court's factual determination that trial counsel was on notice they should retain additional experts by "clear and convincing evidence." *Id.* In particular, the district court reasoned that Mr. Sparger's testimony "[did] not conclusively show that he had an 'inability to recall' [a plan to retain an additional expert]. Rather, Sparger expressly testified that he 'was never told . . . by Dr. Weilenman . . . that there was testing [that needed to be done]." DE 75 at 14 (quoting DE 13-16 at 89). In applying the clear-and-convincing standard under (e)(1), rather than the reasonableness standard of

27

(d)(2), the district court improperly discounted the totality of the evidence and reduced its inquiry to a credibility contest between the "contradictory testimony" of Mr. Sparger, Ms. Davis, and Dr. Weilenman.  Had the district court applied section 2254(d)(2), it would have concluded that the breadth of testimony and contemporaneous documentary evidence presented was "sufficient to undermine confidence in the outcome."  *Jones*, 2022 WL 16731981, at *20.

Notwithstanding Mr. Sparger's failure to recall details surrounding a January 2005 defense team meeting over six years after Petitioner's trial, *see* Statement of the Case, p. 4, *supra*, and at least eight-years after that discussion occurred, the record confirms the discussion and important details about its substance.  Substantial documentary evidence contemporaneous with the events it describes corroborates that the defense team agreed that they should retain additional experts to conduct psychological testing.

For example, on December 3, 2004, Ms. Davis emailed Mr. Sparger:

> I want to talk to you on M[o]nday (or this weekend if you are in your office) about Darryl.  I am attaching several amicus briefs that were filed with the Supreme Court in relation to the case they are hearing re juvenile death penalty.  (The briefs are in adobe format.)  The studies related to developmental issues are very apparent in Darryl's case.  There are also several articles re the same. I think his immaturity and mental health problems make this especially relevant.  I'm not sure what experts have seen him other than Jane [Weilenman] but *we probably need a specialist in that field to explain the impulsiveness, lack of judgment, etc.*

28

DE 19-9 at 38346 (emphasis added).  Ms. Davis also identified such a specialist—

Dr. Ruben Gur—who would have connected the science around brain development

to adolescents' behavioral choices.  *Id.*  On December 5, 2004, Mr. Sparger

responded to Ms. Davis, acknowledging that these developmental issues would have

significance as potential mitigation to develop for the sentencing phase of Mr.

Stinski's trial:

> Darryl was just a few months shy of turning 19 (DOB:
> 06/21/83) when the crime occurred (04/10/02).  Thus,
> even if the Supreme Court sets 18 as the magic number, it
> will not directly benefit him.
>
> However, *if they do set a specific number in Simmons*
> [*Roper v. Simmons*, 543 U.S. 551 (2005)], *we can use that*
> *along with Adkins* [*Atkins v. Virginia*, 536 U.S. 304
> (2002)] (can't execute a person who is mentally retarded),
> *to argue that someone who is mentally under the age of 18*
> *should not be executed*.

*Id.* at 38346 (emphasis added).

Even absent this documentary evidence, Mr. Sparger did not need to be

informed by Ms. Davis or Dr. Weilenman of the "developmental issues [that were]

very apparent in Darryl's case."  *Id.*  Mr. Sparger and everyone else on the defense

team had formed that impression independently.  *See* DE 13-15 at 160:11-161:5

(Darryl "seemed young for his age, and . . . Schiavone had the same impression and

even Dale [Davis] and Dr. Weilenman had mentioned it"); DE 13-16 at 389:3-390:1

(according to Mr. Yancey, Darryl "seemed to be much younger" than 19 and "acted like a much younger person" than "a 17-year old").

When the defense team convened in January 2005, they also all expressed their agreement with Ms. Davis's recommendation that Mr. Stinski undergo a neuropsychological exam, and even identified a neuropsychologist, Dr. Jeffrey Arnett, for the role. *See* DE 13-19 at 835:7–837:5, 911:5–7. Dr. Weilenman's notes taken at the meeting, which refer to Dr. Arnett and other then-leading experts in the field of adolescent crime and scientific literature they had published on the subject, corroborated Ms. Davis's testimony. DE 23-21 at 70747. When Mr. Sparger was shown Dr. Weilenman's notes, he testified that he forgot the information but "wish[ed] [he] had known" it and that "someone . . . could present" it. DE 13-16 at 304:22–305:9. Nevertheless, the district court reasoned that Mr. Sparger's testimony "[did] not conclusively show that he had an 'inability to recall' [a plan to retain an additional expert]" based on a standalone statement. Instead, the district court noted: "Sparger expressly testified that he 'was never told . . . by Dr. Weilenman . . . that there was testing [that needed to be done]." DE 75 at 14 (quoting DE 13-16 at 89).

Rather than consider Mr. Sparger's entire testimony, along with contemporaneous evidence corroborating that neuropsychological testing had been recommended,[6] the district court discredited "a single page from Dr. Weilenman's

---

[6] *See* Section II.B.1, *infra*.

notes that shows a list of purported experts and scientific literature, and trial counsel's impression that Petitioner 'seemed young for his age.'" DE 72 at 26. The district court further discounted, without stating why, Ms. "Davis's testimony asserting that she raised the need for a neuropsychological exam," *id.*, when in fact she had advised exactly that and included an expert recommendation. DE 19-9 at 38346–47.[7] And the district court ignored Mr. Sparger's testimony, about the January 2005 meeting: "And at some time during the meeting, and I cannot remember if Dale said it or Dr. Weilenman—Dale Davis said it or Dr. Weilenman—there was mention of—oh, the head guy —neuropsychologist or neuropsychiatrist about maybe we should've had Darryl checked." DE 13-15 at 158:20-159:12. The district court's failure to engage the above-described documentary evidence and testimony demonstrates that the court failed to consider the totality of the evidence presented in the state court, as required by Section 2254(d)(2).

There were expert witnesses available who could have presented the information referenced in Dr. Weilenman's notes. But Mr. Sparger did not follow up with Ms. Davis or Dr. Weilenman after the January 2005 meeting. *See* DE 13-15 at 156:21–157:4, 161:6–22; DE 13-19 at 909:1–913:9. According to Mr. Sparger he was not responsible for supervising their work. *See* DE 13-15 at 156:21–157:4, 161:6–22. And so, neither he nor his co-counsel communicated with Ms. Davis or

---

[7] *See* Section II.B.1, *infra*.

Dr. Weilenman for two years until only months remained before Mr. Stinski's trial. *Jones*, 2022 WL 16731981, at *11 ("[C]ounsel's failure to obtain a mental health expert was based not on strategy, but on lack of preparation, which left counsel unaware of the importance of this evidence."). It follows that trial counsel neglected to implement Mr. Sparger's stated strategy of using Mr. Stinski's mental health issues and relative youth to explain to his sentencing jury why Mr. Stinski acted and failed to act the way he did.

It is well-settled "that a 'failure to investigate thoroughly [that stems] from inattention, not strategic judgment,' serves to 'underscore[] the unreasonableness of counsel's conduct.'" *Jefferson*, 941 F.3d at 481 (quoting *Wiggins*, 539 U.S. at 526) (alterations in original). In particular, when, as here, trial "'counsel ignores "red flags" that any reasonable attorney would perceive as demanding further investigation,'" their "failure . . . to arrange for neuropsychological testing resulted in the exact kind of non-strategic decision that underscores the unreasonableness of their conduct." *Jefferson*, 941 F.3d at 481 (citation omitted); *see also Lopez*, 845 F. App'x at 552 ("Because counsel's mitigation strategy was to attribute [the defendant's] conduct to his difficult upbringing and resulting psychological state and to ask the jury to give him hope for the possibility of parole, his failure to introduce readily available expert evidence opining that he could be capable of rehabilitation and *drawing the key causal connections* he asked the jury to find was not a

reasonable strategic decision." (emphasis added)); *Workman*, 689 F.3d at 1204 (reversing denial of habeas relief on ineffective assistance of counsel grounds even though counsel presented some mental health evidence during the penalty phase, among other reasons, because counsel "made little effort to connect Dr. Murphy's diagnosis to the circumstances of the crime" and "[t]he importance of counsel's role in this regard cannot be overstated").

## III.    THE DISTRICT COURT ALSO ERRED IN FINDING THAT THE STATE COURT'S PREJUDICE DETERMINATION WAS NOT BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS

To succeed on an ineffective assistance of counsel claim, once a petitioner has established that his counsel rendered ineffective assistance, *Strickland* also requires the petitioner to show that the ineffective assistance prejudiced him.  In a challenge to a death sentence, "the [prejudice] question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  The balance of circumstances "must 'consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding . . . against the evidence in aggravation.'" *Pye*, 50 F.4th at 1042 (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009)).

Trial counsel's ineffective assistance prejudiced Mr. Stinski at the mitigation phase of his capital trial.  Specifically, counsel's failure to "connect the dots" left the

jury with no framework with which to assess his culpability given the extensive physical and emotional trauma evident in his social history. Counsel's failure was all the more crucial given Mr. Stinski's youth and the aggravating factors surrounding the underlying crime. "[B]ut for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, because there is a reasonable probability that at least one juror would have come to a different conclusion. *Pye*, 50 F.4th at 1058 (Jordan, J., concurring) ("[B]ecause Georgia law requires a unanimous jury recommendation of death the focus is on whether one juror would have come to a different conclusion.") (citing *Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020)).

Had the district court "reweigh[ed]" all circumstances, including the mitigation evidence adduced at trial and in the habeas proceeding, it would have been "hard pressed to conclude that there is *no* reasonable probability that a jury would have recommended a life sentence over the death penalty." *Maples*, 729 F. App'x at 827. Instead, the district court listed all aggravating factors before concluding that "it is hard to imagine that any amount of mitigating evidence could have outweighed it." DE 72 at 32–34; *but see Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011) (mental health expert opinions can "serve[] to reduce the volitional nature of the crime . . . and as a result, undercut the senselessness and cold-blooded nature of the crime . . . and, importantly, explain [the defendant's] odd, disaffected

behavior afterwards"); *Jones*, 2022 WL 16731981, at *21 (absent neuropsychological expert testimony, "[t]he sentencing judge 'heard almost nothing that would humanize [defendant] or allow [him] to accurately gauge his moral culpability" (citing *Porter*, 558 U.S. at 41)).

It is well-recognized that a necessary precondition to a capital sentencing jury's engaging in the constitutionally required individual consideration is that counsel supply the jurors with evidence concerning the defendant's background and character and an explanation why that evidence reduces the defendant's culpability for his crimes. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251 n.13 (2007). For example, in *Lopez v. Attorney General*, the Ninth Circuit affirmed the grant of habeas corpus to a petitioner sentenced by a jury to life imprisonment without (rather than with) the possibility of parole and who alleged that his trial counsel rendered ineffective assistance at the sentencing phase of his trial by failing to submit expert evidence to provide such an explanation. *See Lopez*, 845 F. App'x at 554. The court in *Lopez* held that the state court "unreasonably applied *Strickland* when it failed to consider" trial counsel's failure to introduce an expert psychological opinion "(1) connecting [the petitioner's] actions to his difficult childhood, (2) giving credence to the fact that he committed the crime impulsively, and (3) explaining that studies indicated a reduced risk of future dangerousness given [the defendant's] age at the time of the crime." *Id.* at 552–53.

35

Similarly, in *Hooks v. Workman*, 689 F.3d at 1204, the Tenth Circuit reversed the denial of habeas relief on ineffective assistance of counsel grounds, among other reasons, because even though counsel presented some mental health evidence during the penalty phase, counsel "made little effort to connect Dr. Murphy's diagnosis to the circumstances of the crime." As the court explained, "[t]he importance of counsel's role in this regard cannot be overstated, as we have repeatedly recognized. Counsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Id.*

In other words, courts have recognized trial counsel's obligation to provide juries not just with mitigation evidence but also with a roadmap to understand that evidence and to place it in the context of the particular defendant and his crimes. The state court's conclusion that Mr. Stinski suffered no prejudice was based on an unreasonable determination that counsel satisfactorily presented the mitigation evidence.

### A. Connecting Petitioner's Physical and Emotional Trauma to his Culpability Was Crucial to Mitigation

As the state habeas court determined, the jury was presented with "extensive" evidence of the physical and emotional trauma that characterized the Mr. Stinski's life. DE 75 at 2–3; DE 72 at 21–22 (quoting DE 27-20 at 5). As Mr. Sparger

admitted, however, critically missing was any explanation of how that evidence affected Mr. Stinski's culpability.  DE 13-16 at 305:11–306:3.  The mental health evidence from three well-qualified experts presented at the state habeas hearing did precisely that.  Significantly, in response to this testimony, the State offered no rebuttal expert opinion.

The district court concluded that the state habeas court's finding that Mr. Stinski had suffered no prejudice was not unreasonable because the expert mental health evidence supposedly was cumulative of what was presented to the jury.  DE 72 at 29-31.  The district court characterized each of the three experts as doing nothing more than offering a "more detailed conclusion of what Dr. Weilenman testified about during trial."  *Id.* at 29.  Having concluded that the expert evidence was cumulative, the district court held that "the new mitigating evidence provided by Drs. James, Ash and Garbarino 'would barely have altered the sentencing profile' presented at Petitioner's trial."  *Id.* at 31 (quoting *Strickland*, 466 U.S. at 700).  This was error.

In concluding that the state habeas court's determination was not unreasonable, the district court alluded to the fact that Dr. Weilenman had performed a "psychological evaluation" of Mr. Stinski and that:

> Dr. Weilenman specifically described Petitioner's lack of "moral reasoning and risk assessment" and noted that "[a]t the time of the crimes, due to his age and developmental stage, [Petitioner] demonstrated a pattern of poor insight, and decision-making skills." ([DE 26-19] at pp. 151–52.) Dr. Weilenman also noted Petitioner's "limited ability to restrain impulses" and failure to "consider an alternative course of action." (*Id.* at p. 151.)

DE 72 at 23-24. Yet this description ignores Dr. Weilenman's testimony. She described her testimony as presenting a social history.[8] On cross-examination, she disavowed doing anything more than a social history, and specifically disavowed any notion she had reached any expert diagnosis or that any of her observations about Mr. Stinski were based on any testing:

> Q. And correct me if I'm wrong, but have you done any psychological test on the defendant?
>
> A. None.

DE 10-11 at 2830:23–25.

> Q. So you really haven't come to court with any kind of diagnosis; you're just giving us a social history?
>
> A. Correct.

*Id.* at 2838:16–18.

---

[8] As Dr. Garbarino testified, a social history is "part of the raw materials from which an analysis comes, because ordinarily it doesn't have much or any analysis. It's a reporting, a kind of narrative reporting of events, and facts, and quotes from people." DE 13-21 at 1349:23-1350:16. Dr. Garbarino's characterization of a social history aptly describes Dr. Weilenman's testimony at trial.

Q. And your job was to—not to assess any criminal responsibility on this defendant's part. Is that correct?

A. Correct.

Q. And your assessment of Darryl being like a twelve year old, is that—that's not based on any testing. Is that correct?

A. Correct.

Q. So there's no objective way of determining whether yours is a good assessment or not. Is that correct?

A. Correct. It's just based on my history of working with that population, both in the YDC, in private practice, and having my own children, and being around kids.

*Id.* at 2840:1–12.

As discussed below, this starkly contrasts with the testimony of Drs. James. Ash, and Garbarino and renders unreasonable any conclusion that those experts were merely cumulative of Dr. Weilenman's testimony.

**B.    Dr. Joette James Conducted Rigorous Neuropsychological Testing**

Dr. James is a board-certified clinical neuropsychologist who evaluated Mr. Stinski's neurocognitive strengths and weaknesses based on a six hour meeting and various tests she performed.  DE 13-20 at 1150:16–1151:4, 1157:14–22, 1158:24–1159:21, 1164:23–1165:22.  Based on the testing she conducted, Dr. James identified "abnormalities in brain function," including weaknesses in executive functioning that were genetic and exacerbated by Mr. Stinski's history of severe maltreatment.  *Id.* at 1167:9-13, 1187:6-1190:15.  In particular, Dr. James testified

39

that, on the night of the crimes, Mr. Stinski's deficits combined with the high level of stress he was experiencing compromised his ability to "reason and think of alternatives, to not become inflexibly stuck in a pattern that is going nowhere, to be able to consider pros and cons and multiple sources of information, and to act and adapt in an appropriate way." *Id.* at 1220:10-1221:8.

Dr. James concluded that Darryl was functioning at an adolescent level at the time of the crimes given "the combination of the effects, neuropsychologically and neurologically, of the severe maltreatment and his preexisting neurodevelopmental vulnerabilities." *Id.* at 1222:9-1223:7.

In contrast, Dr. Weilenman is a clinical psychologist and not a neuropsychologist. She performed no diagnostic testing on Mr. Stinski and offered no diagnostic opinions. DE 10-11 at 2830:23–25, 2838:16–18. Unlike Dr. James' scientific approach, Dr. Weilenman offered little more than her anecdotal observations based on her interviews and a review of Mr. Stinski's social history. For example, unlike Dr. James testing-based conclusion that Mr. Stinski was functioning at an adolescent level, Dr. Weilenman offered little more than an observation that Mr. Stinski interacted like a twelve-year-old. DE 10-11 at 2821:1–22.

Dr. James' testimony was neither cumulative nor merely a better sounding recapitulation of testimony given by Dr. Weilenman. *See Lopez*, 845 F. App'x at

552-54; *Hooks*, 689 F.3d at 1204; *Maples*, 729 F. App'x at 827.  It was the product of scientific expertise that Dr. Weilenman did not have and testing that Dr. Weilenman did not perform.

### C.   Dr. Peter Ash Explained Hallmarks of Adolescent Crime in Mr. Stinski's Behavior the Night of the Crime

Dr. Peter Ash is an expert in psychiatry and forensic psychiatry.  DE 13-17 at 431:7–15.  He is a full-time associate professor in the department of psychiatry and behavioral sciences at Emory University where he has done research in, among other areas, adolescent culpability.  *Id.* at 417:24–423:14.

Dr. Ash testified that certain facts concerning Mr. Stinski's life history were particularly significant in assessing his developmental level, particularly on the night of the crime.  The first "was that prior to the crime, there really was no history of violence towards others . . . , which was really quite striking."  *Id.* at 441:3–444:3; *see also id.* at 479:4–481:2 ("One of the things that is striking in Darryl's history is there's really nothing in there about prior violent episodes.  He is seemingly less violent than most kids.").  That fact was striking to Dr. Ash because "commonly when you see people involved in violent offenses, you get a history of prior violence, and the strongest predictor of future violence is prior violence."  *Id.* at 479:9–12.  Second, Mr. Stinski's history is "really one of repeated psychological maltreatment," including a "history of pervasive rejection, neglect, [and] being isolated [that] was quite striking."  *Id.* at 441:3–444:3.  As Dr. Ash explained:

41

> Because all of [Mr. Stinski's] moves [between homes of
> different family members and friends], each of them,
> really represented to him a rejection. It wasn't like he said,
> "Oh, I don't like it here; I want to leave." It was like
> people said "go." And so it was a constant replaying of
> this rejection, . . . which had been a theme for his whole
> life, really.

*Id.* at 449:17–21.

Dr. Ash further testified that, at the time of the crime, Mr. Stinski was functioning at an adolescent level. *Id.* at 462:13–24. Dr. Ash based his opinion on a number of factors. First, the "global impression" of witnesses who knew Mr. Stinski was that he was immature and seemed much younger than his chronological age. Second, "his peer skills were much weaker than those of his peers," which indicates "that he was functioning psychologically, interpersonally at an earlier level." Third, "all of the maltreatment he had experienced" caused a loss of self-confidence and caused him to function at a younger age level. Finally, the time of the crime was an "especially stressful" period for Mr. Stinski. Under such stress, people do not operate at their best and "tend to be at a somewhat regressed level, even for their otherwise normal functioning." *Id.* at 490:19–492:6. Dr. Ash concluded that Mr. Stinski was functioning at the level of a thirteen- to fifteen-year-old at the time of the crime, which is consistent with the results of the neuropsychological testing performed by Dr. James. *Id.* at 492:7–493:1. As Dr. Ash explained,

> . . . the patterns of adolescent crime and the patterns of
> adult crime tend to be different in that adolescents tend to
> offend in groups and their crimes tend to be impulsive.
> Whereas, adults tend to offend alone and they tend to be
> more planned out.
>
> In addition, adults tend to have one kind of crime that they
> do over and over and over. Whereas, adolescents tend to
> be much more diversified.

*Id.* at 460:5–461:6. The crimes for which Mr. Stinski was convicted involved

multiple perpetrators and the violence was impulsive, at least in Mr. Stinski's mind,

because it was not planned.  *Id.*

Thus, unlike Dr. Weilenman, who merely testified that Mr. Stinski wanted to

"fit in," Dr. Ash explained that when Mr. Stinski saw that Dorian had murdered

Susan Pittman, he thought "'[i]f Dorian could kill her, then he could easily kill me'"

and then "[h]is own sense of survival, that he needed to act in some ways to protect

himself kicked in."  *Id.* at 458:4-22.  Dr. Ash further explained that Mr. Stinski's

participation in the crimes in the Pittman home exhibited all the "hallmarks of

adolescent crime."  *Id.* at 460:5-462:1.  Dr. Ash's further presented the "generally

accepted view[s] of the [psychological and medical] professions" that adolescents,

for these reasons, are less culpable than adults for crimes they commit.  *Id.* at

486:18–488:22.

Although the district court found that this was simply a "more detailed

conclusion" of what Dr. Weilenman testified to, there is no viable analog in Dr.

Weilenman's testimony.  Dr. Ash explained, in detail, how Mr. Stinski's life experiences (mostly characterized by extreme trauma) stunted his maturation and, significantly, how that affected Mr. Stinski on the night of the crime.  Nothing in Dr. Weilenman's testimony connects the dots in this way.

### D.     Dr. James Garbarino Concluded Mr. Stinski Was An Untreated, Traumatized Child the Night of the Crime

Dr. James Garbarino is an expert in developmental psychology who focuses on trauma, abuse, violence, and alienation in childhood and adolescence.  DE 13-21 at 1322:21–1323:23, 1333:3–13.  He is on the faculty at Loyola University in Chicago, Illinois and also is involved in forensic consulting, including as an expert witness mostly in cases involving violence.  *Id.* at 1322:21–24, 1324:18–1325:11. In the latter capacity, Dr. Garbarino attempts "to help judges and juries make sense of how the life experience of defendants as children and adolescents can provide some understanding for how they get to the point where they're in court for, usually for murder." *Id.* at 1330:3–9.

Dr. Garbarino testified that Mr. Stinski had among the most severe cases of psychological maltreatment in his experience:

> Q. And comparatively, where does Darryl's maltreatment fall within the spectrum of cases on which you've worked?

> A. Well, I would say that this is among the most severe cases, pervasive cases of psychological maltreatment in my experience. I've certainly dealt with cases with much worse physical abuse, and much worse sexual abuse. But this case is among the worst for psychological maltreatment.

*Id.* at 1363:12–1364:5.  Dr. Garbarino rendered this opinion despite his involvement with children in war-torn countries.  *Id.*  He added that given Mr. Stinski's vulnerabilities and his craving for acceptance, which created "a perfect negative storm" (*id.* at 1396:13), Mr. Stinski was drawn to Dorian O'Kelley who "was a clearly highly-disturbed, highly-aggressive young person who . . . was generating this whole murderous scenario." *Id.* at 1396:24–1397:16.  Dr. Garbarino ultimately concluded that, given the severe maltreatment that Darryl experienced, he was an untreated, traumatized child at the time of the crime:

> Q. Dr. Garbarino, based upon your work in this case, what is the ultimate conclusion of your analysis?
>
> A. Well, the conclusion is that the best way to understand Darryl is, certainly at the time of the crime, is as an untreated, traumatized child who inhabited the body of an 18-year – old boy, and that understanding that makes his behavior before, and during, much more comprehensible, and . . . gives a basis for saying that as a victim of pervasive, chronic psychological maltreatment, . . . his ability to resist the influence of Dorian O'Kelley was significantly impaired, and that all of this is important mitigation in any decision about his future, whether it be death penalty, or life in prison, or presume a possibility of parole.

*Id.* at 1411:4–16; *see also id.* at 1443:11–1444:3.

45

Here again, Dr. Garbarino's testimony was a world away from the social history and unscientific observations that Dr. Weilenman presented to jury. Yet the district court simply waved those differences away, finding that "[w]hile Dr. Garbarino seemed to provide a better explanation of how the trauma [Mr. Stinski] faced adversely impacted his neuropsychological development and grounded his testimony in scientific research more so than Dr. Weilenman, that testimony simply arrived at the same conclusion as Dr. Weilenman." DE 72 at 30. As noted above, this fails to account for the limits of Dr. Weilenman's testimony and her confessed lack of any diagnosis. It fails to account that Dr. Weilenman does not devote her work to the study of trauma in childhood and adolescence. Finally, it fails to appreciate that grounding an opinion in scientific research would be more likely to impact a jury. *See Maples*, 729 F. App'x at 827 ("All things considered, the quality of the mitigation evidence is important."). In short, Dr. Weilenman was not a substitute for Dr. Garbarino's expertise, his scientific methods and research, and his vast experience with child and adolescent victims of severe trauma.

## E.     Connecting Petitioner's Physical and Emotional Trauma to his Culpability was Especially Important in Light of the Aggravating Factors

Given that the district court ascribed little value to the expert testimony, it is unsurprising that the court made little effort to balance that evidence against the "highly aggravating" evidence that favored imposition of the death penalty. *See* DE

46

72 at 31–32.  But when viewed for what it actually was—non-cumulative and highly probative evidence about how the various traumas affected Mr. Stinski—the expert evidence adduced at the state habeas hearing renders the determination that Mr. Stinski suffered no prejudice unreasonable.  Significantly, unlike any testimony from Dr. Weilenman, the expert testimony adduced in the habeas proceeding placed the horrible and violent nature of the crimes in the context of Mr. Stinski's mental and psychological development.  *See Ferrell*, 640 F.3d at 1234 (testimony from three mental health professionals averred to neuropsychological deficits that would have "measurably weaken[ed] the aggravating circumstances").

In this light, it was all the more important that the jury be provided with evidence that contextualized the circumstances surrounding the aggravated nature of the crimes.  *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("[W]e see no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an appropriate case [evidence about the defendant's disadvantaged background, or emotional or mental problems] would counsel imposition of a sentence less than death.").  Dr. Weilenman made no effort to do so but the expert testimony presented by Drs. James, Ash, and Garbarino did.  For example, where Dr. Weilenman offered no insight into Mr. Stinski's mindset or behavior on the night of the crime, Dr. James explained how Mr. Stinski's deficits in executive functioning affected him on that night:

47

> Because of the types of neuropsychological deficits that I
> was able to see in his profile, the types of deficits involving
> working memory, attention, and organization, at the time
> of the crime . . . he was in a situation where there was a
> high amount of stress . . . [and] there's vulnerability and a
> lower threshold to overwhelm in folks with this kind of
> profile . . . . His ability to . . . reason and think of
> alternatives, to not become inflexibly stuck in a pattern . .
> . to be able to consider pros and cons and multiple sources
> of information, and to act and adapt in a[n] appropriate
> way, all of those skills become very much compromised.

DE 13-20 at 1220:13–1221:4.

In addition, that Mr. Stinski had no prior violent episodes was striking to Dr. Ash because "the strongest predictor of future violence is prior violence." DE 13-17 at 479:9-12.[9] Dr. Ash further testified that Mr. Stinski "seems to be a very non-violent person" and "so the high levels of violence obviously in the crime are an out-of-character phenomenon for him." *Id.* at 479:24-480:2. Dr. Ash further testified that during the weeks leading up to the crime, Mr. Stinski was under "immense stress," "really just rootless and adrift and feeling very much . . . rejected by everybody." *Id.* at 450:15–451:7. Dr. Weilenman offered no such testimony.

Similarly, and different from Dr. Weilenman's testimony, Dr. Garbarino explained:

---

[9] *See also* Section III.C, *supra*.

> I've certainly met kids . . . with a lot of psychological maltreatment and abuse[] who are really mean-spirited, nasty, aggressive, hostile. And what's really striking about Darryl is . . . except for the aberration of this crime, there's almost none of that. . . . [T]his is a person who, had he been given a supportive, stable family, could have – all the nice things that people say about him would have been said . . . by everybody.

DE 12-21 at 1380:7–15; *see also id.* at 1345:3–11. Based on this observation, Dr. Garbarino concluded that Mr. Stinski "at the time of the crime, [was] an untreated, traumatized child who inhabited the body of an 18-year-old boy." *Id.* at 1411:4–16.[10]

In sum, with the benefit of the evidence provided by Drs. James, Ash, and Garbarino (but not by Dr. Weilenman), there is a reasonable probability that the result would have been different and, as a result, Mr. Stinski established that he was prejudice by trial counsel's ineffective assistance. *Strickland*, 466 U.S. at 694. The district court's failure to recognize that—given all the evidence—the state habeas court's failure to find prejudice was unreasonable.

---

[10] *See also* Section III.D, *supra*.

## CONCLUSION

For the foregoing reasons, this Court should reverse and remand to the district court with instructions to apply the appropriate standard.

November 23, 2022

Respectfully submitted,

/s/ Jeffrey A. Fuisz

Jeffrey A. Fuisz
Robert M. Grass
Lori B. Leskin (application for admission *forthcoming*)
Sheila S. Boston (application for admission *forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel:  212.836.8000
Fax:  212.836.8589
jeffrey.fuisz@arnoldporter.com
robert.grass@arnoldporter.com
lori.leskin@arnoldporter.com
sheila.boston@arnoldporter.com

Richard K. Hines, V
Georgia Bar No. 356300
Lucas A. Westby
Georgia Bar No. 594008
NELSON MULLINS RILEY & SCARBOROUGH
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, GA 30603
Tel:  404.322.6272
Fax:  404.322.6050
richardhines@nelsonmullins.com
lucas.westby@nelsonmullins.com

*Attorneys for Appellant Darryl Stinski*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,988 words. I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman, 14-point font.

Date: November 23, 2022

*/s/ Jeffrey A. Fuisz*
Jeffrey A. Fuisz

## CERTIFICATE OF SERVICE

I certify that I caused the foregoing document to be served on all counsel of record by filing it on the Court's docket through the CM/ECF system on November 23, 2022.


*/s/ Jeffrey A. Fuisz*
Jeffrey A. Fuisz