No. 22-12898-P

In the

# United States Court of Appeals
## for the Eleventh Circuit

Darryl Stinski,

*Appellant/Petitioner*,

v.

GDCP Warden,

*Appellee/Respondent*.

On Appeal from the United States District Court for the
Southern District of Georgia, Savannah Division.
No. 4:18-cv-66 — Hon. R. Stan Baker, *Judge*

## BRIEF OF APPELLEE

Christopher M. Carr
*Attorney General of Georgia*
Beth A. Burton
*Deputy Attorney General*
Sabrina D. Graham
*Senior Assistant Attorney
General*

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 694-7975
sgraham@law.ga.gov
*Counsel for
Appellee/Respondent*

Stinski v. Warden, GDCP No. 22-12898-P

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

1. Arnold & Porter Kaye Scholer LLP, Office of Counsel for Petitioner;

2. Baker, Hon. R. Stan, Federal Habeas Judge, United States District Court, Southern District of Georgia;

3. Bass, Jr., Hon. James F., State Trial Court Judge, Eastern Judicial Circuit of Georgia;

4. Boston, Sheila S., State and Federal Habeas Counsel for Petitioner;

5. Brooks, Stephen M., State and Federal Habeas Counsel for Petitioner;

6. Burris, C. Kawezya, State Habeas Counsel for Petitioner;

7. Burton, Beth A., Deputy Attorney General, Counsel for Respondent;

8. Caldwell, Antoine, Warden and Respondent-Appellee;

9. Carr, Christopher M., Attorney General, Counsel for Respondent;

10. Chatman, Bruce, Former Warden and Respondent;

11. Dozier, Gregory C., Former Commissioner and Respondent;

12. Ford, Benjamin, Former Warden and Respondent;

Stinski v. Warden, GDCP No. 22-12898-P

13. Fuisz, Jeffrey A., State and Federal Habeas Counsel for Petitioner;

14. Graham, Sabrina, Senior Assistant Attorney General, Counsel for Respondent;

15. Grass, Robert M., State and Federal Habeas Counsel for Petitioner;

16. Hines, V, Richard K., State and Federal Habeas Counsel for Petitioner;

17. Humphrey, Carl, Former Warden and Respondent;

18. Iannuzzi, Kate, Former Assistant Attorney General, State Habeas Counsel for Respondent;

19. Jones, Shalena Cook, District Attorney, Eastern Judicial Circuit of Georgia;

20. Leskin, Lori B., State and Federal Habeas Counsel for Petitioner;

21. Lock, David T., Former Chief Assistant District Attorney, Eastern Judicial Circuit of Georgia;

22. McConnell, Greg, Assistant District Attorney, Eastern Judicial Circuit of Georgia;

23. Nankali, Natasha, State Habeas Counsel for Council of Superior Court Judges of Georgia;

24. Nelson Mullins Riley & Scarborough, LLP, Office of Counsel for Petitioner;

25. O'Kelley, Dorian, Co-defendant;

Stinski v. Warden, GDCP No. 22-12898-P

26. Olens, Samuel S., Former Attorney General and Counsel for Respondent;

27. Pittman, Kimberly, Victim;

28. Pittman, Susan, Victim;

29. Schiavone, Michael, Trial and Direct Appeal Counsel for Petitioner;

30. Scott, John W., State Habeas Counsel for Petitioner;

31. Sellers, Eric, Former Warden and Respondent;

32. Short, Jason, State Habeas Counsel for Petitioner;

33. Sizemore, Jr., Hon. W. James, State Habeas Judge, Southwestern Judicial Circuit of Georgia;

34. Sparger, Steven, Trial Counsel for Petitioner;

35. Stinski, Darryl Scott, Petitioner-Appellant;

36. Upton, Stephen, Former Warden and Respondent;

37. Watkins, Mitchell, Former Assistant Attorney General and Counsel for Respondent;

38. Weinberger, Dana, Former Assistant Attorney General and Counsel for Respondent;

39. Westby, Lucas A., State and Federal Habeas Counsel for Petitioner; and

Stinski v. Warden, GDCP No. 22-12898-P

40. Yancey, II, Willie T., Trial Counsel for Petitioner.


/s/*Sabrina Graham*
Senior Assistant Attorney General

## STATEMENT REGARDING ORAL ARGUMENT

Respondent/Appellee requests oral argument in this case. This is a death penalty case and oral argument will assist this Court in reviewing the substantial factual record upon which the opinions of the lower courts were based.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ............................................................ v

Statement of Issue ............................................................. 1

Introduction ................................................................... 1

Statement of the Case .......................................................... 1

    A. Facts of the Crimes ..................................................... 1

    B. Proceedings Below ...................................................... 5

        1. Trial Proceedings .................................................. 5

            a. Sentencing Phase Preparation ................................. 6

            b. Sentencing Phase Presentation ............................... 11

        2. Motion for New Trial Proceedings ................................. 19

        3. Direct Appeal Proceedings ........................................ 19

        4. State Habeas Proceedings .......................................... 19

        5. Federal Habeas Proceedings ....................................... 20

    C. Standard of Review ..................................................... 22

Summary of Argument ........................................................... 23

Argument ...................................................................... 24

    I. The district court applied § 2254(d)(2) and § 2254(e)(1) in a manner consistent with this Court's binding precedent.... 24

        A. This Court defined the interplay between § 2254(d)(2) and § 2254(e)(1) in *Pye*. ................................................. 25

# TABLE OF CONTENTS
## (continued)

**Page**

    B.  Stinski's interpretation of the interplay between § 2254(d)(2) and § 2254(e)(1) conflicts with *Pye*. .......... 30

II.  The district court's review of the state court's factfindings and decision about trial counsel's investigation of mental health evidence under § 2254(d)(2) and § 2254(e)(1) was correct.................................................................................. 32

    A.  The state court did not make a cumulative finding about *Strickland's* deficiency prong. ....................................... 34

    B.  The district court properly applied § 2254(e)(1) in examining the state court's finding that trial counsel's mental health expert did not suggest further testing. . 35

        1.  Brief Procedural History........................................... 36

        2.  Under *Pye*, the district court correctly applied the § 2254(e)(1) standard to the individual state court factfinding at issue.  Alternatively, Stinski's attack on the state court's factfinding under § 2254(d)(2) also fails.................................................................... 39

    C.  The district court correctly determined under § 2254(d)(2) that the state court's decision that counsel's investigation was reasonable. ....................................... 48

III.The district court correctly applied § 2254(d)(2) in examining the state court's prejudice determination. ....... 52

    A.  The district court properly examined the state court's "largely cumulative" finding. ....................................... 52

    B.  The district court properly examined the state court's prejudice decision. ....................................... 61

# TABLE OF CONTENTS
## (continued)

**Page**

Conclusion ........................................................................ 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bishop v. Warden, GDCP,*
  726 F.3d 1243 (11th Cir. 2013) ................................................. 39

*Burt v. Titlow,*
  571 U.S. 12 (2013) ..................................................... 51

*Dallas v. Warden,*
  964 F.3d 1285 (11th Cir. 2020) ................................................. 53

*Darling v. Sec'y, Dep't of Corr.,*
  619 F.3d 1279 (11th Cir. 2010) ................................................. 50

*Dunn v. Reeves,*
  141 S. Ct. 2405 (2021) ............................................. 51

*Gavin v. Comm'r, Ala. Dep't of Corr.,*
  40 F.4th 1247 (11th Cir. 2022) ................................................. 59

*Gissendaner v. Seaboldt,*
  735 F.3d 1311 (11th Cir. 2013) ...........................................46, 49

*Hayes v. Sec'y, Fla. Dep't of Corr.,*
  10 F.4th 1203 (11th Cir. 2021) ................................................. 32

*Holsey v. Warden, Ga. Diagnostic Prison,*
  694 F.3d 1230 (11th Cir. 2012) ...........................................34, 53

*Hooks v. Workman,*
  689 F.3d 1148 (10th Cir. 2012) ................................................. 60

*Jefferson v. GDCP Warden,*
  941 F.3d 452 (11th Cir. 2019) ...........................................50, 51

*Jenkins v. Comm'r, Ala. Dep't of Corr.*,
963 F.3d 1248 (11th Cir. 2020) ............................................40, 41

*Ledford v. Warden, Ga. Diagnostic & Classification
Prison*, 818 F.3d 600 (11th Cir. 2016)......................53, 57, 58, 61

*Lopez v. AG for Nev.*,
845 F. App'x 549 (9th Cir. 2021) ................................................ 59

*Maples v. Comm'r, Ala. Dep't of Corr.*,
729 F. App'x 817 (11th Cir. 2018) .......................................58, 60

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ................................................................. 30

*Murray v. United States*,
145 F.3d 1249 (11th Cir. 1998) ...........................................33, 35

*Nejad v. AG, Ga.*,
830 F.3d 1280 (11th Cir. 2016) ...........................................46, 47

*O'Kelley v. State*,
284 Ga. 758 (2008)............................................................*passim*

*Putman v. Head*,
268 F.3d 1223 (11th Cir. 2001) ................................................ 49

*\*Pye v. Warden, Ga. Diagnostic Prison*,
50 F.4th 1025 (11th Cir. 2022) (en banc).........................*passim*

*Raheem v. GDCP Warden*,
995 F.3d 895 (11th Cir. 2021) .............................................40, 51

*Reaves v. Sec'y, Fla. Dep't of Corr.*,
872 F.3d 1137 (11th Cir. 2017) ................................................ 60

*Stinski v. Georgia*,
562 U.S. 1011 (2010) ................................................................ 19

*Stinski v. State,*
  286 Ga. 839 (2010)..............................................................*passim*

*Whatley v. Warden,*
  927 F.3d 1150 (11th Cir. 2019) ................................................. 62

**Statutes**

28 U.S.C. § 2254......................................................................*passim*

**Other Authorities**

11th Cir. R. 28-5.............................................................................. 2

## STATEMENT OF ISSUE

Whether the district court's application of the interplay between 28 U.S.C. § § 2254(d)(2) and 2254(e)(1), in its review of the state court's ineffective-assistance-of counsel claim, was correct under *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025 (11th Cir. 2022) (en banc), which is this Court's recent binding precedent on the relationship between § 2254(d)(2) and § 2254(e)(1).

# INTRODUCTION

After years of remaining an open question, this Court recently explained the relationship between 28 U.S.C. § § 2254(d)(2) and 2254(e)(1) in *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025 (11th Cir. 2022). In short, the Court held that specific state court *factfindings* are reviewed under § 2254(e)(1), and state court *decisions* are reviewed under § 2254(d)(2). In contravention of this holding, Stinski asks this Court to hold that § 2254(e)(1) applies only if new facts are presented during the federal habeas proceeding. The district court did not employ this application of § 2254(e)(1), which is only endorsed by the Ninth Circuit, but correctly applied the subsections in the manner confirmed in *Pye*. Given that this Court has now spoken on the interplay between § 2254(d)(2) and § 2254(e)(1), Stinski's arguments are foreclosed by binding precedent, and the Court should affirm the district court's decision.

# STATEMENT OF THE CASE

## A. Facts of the Crimes

"The evidence at trial showed that Darryl Stinski and Dorian O'Kelley engaged in a crime spree that spanned April 10-12, 2002." *Stinski v. State*, 286 Ga. 839, 840 (2010). On the evening

1

of April 10, Stinski and O'Kelley attempted to burglarize a house located about fifty to seventy-five feet from the home of "Susan Pittman and her 13-year-old daughter, Kimberly Pittman." *Stinski*, 286 Ga. at 840; D10-7:14.[1]  When that attempt was thwarted, Stinski and O'Kelley chose the Pittman home as their next target.  D10-7:166, 189-90; 204.  Before breaking into the home, Stinski and O'Kelley "turned off the electricity."  *Stinski*, *supra*.  While inside the victims' home, Stinski admitted that they searched for "anything and everything."  D10-7:190.  At some point, they noticed that the victims were inside the residence sleeping—which "amazed" Stinski because of noise they made ransacking the home.  *Id.* at 209.

Stinski and O'Kelley entered Susan Pittman's bedroom first and then beat her with several items, which included a "Mag" flash light, a cane with an eagle's head, a lamp, and a baseball bat.  D10-7:190, 212-13, 218-19, 240-243.  During the beating of Susan Pittman, Stinski held the flashlight for O'Kelley so that he could see what he was doing during the beating.  D10-7:213.  "At

---

[1] Pursuant to 11th Cir. R. 28-5, citations to the record refer to the Electronic Court Filing number associated with the document followed by the appropriate ECF page number.  Where an ECF page number is not provided, the page number assigned by the court reporter located at the bottom of the page is used.

some point, Susan [] was also stabbed three to four times in the chest and abdomen" and "eventually died" from Stinski's and O'Kelley's "attack." *Id.*

During this brutal beating, Stinski left the room "to subdue Kimberly [], who had awakened to her mother's screams" and took her "upstairs so that she would not hear her mother's screams." *Stinski*, *supra* at 841. After murdering Kimberly's mother, Stinski and O'Kelley brought Kimberly "downstairs, drank beverages, and discussed 'tak[ing] care of' her.'" *Id.* Stinski then "took Kimberly [] back upstairs and bound and gagged her." *Id.* "As Stinski rummaged through the house downstairs, O'Kelley raped Kimberly." *Id.* Stinski returned upstairs and saw that Kimberly was naked from the waist down, was bleeding from her vagina, and had blood smeared around her buttocks and thighs. D10-7:195-96, 230, 143-44. "Stinski and O'Kelley then agreed that Stinski would begin beating Kimberly [] with a baseball bat when O'Kelley said a particular word." *Stinski*, *supra* at 841. Stinski confessed that "[o]n cue" he "hit Kimberly [] in the head with the bat as she knelt on the floor, bloody from the rape and with her hands bound." *Id.* O'Kelley then slit Kimberly's throat several times with a knife. D10-7:196, 228-89. Because Kimberly was still alive and fighting back, O'Kelley attempted to strangle her to

death. *Id.* at 229-30. After going downstairs and coming back to Kimberly's room, Stinski "hit Kimberly [] in her knee with the bat as O'Kelley tried to suffocate her. O'Kelley then took another knife and stabbed her in the torso and legs. O'Kelley kicked her and threw objects at her head, but her groans indicated that she was still alive." *Stinski, supra* at 841. Stinski admitted that they eventually "gave up," D10-7:231, and "set fires throughout the house and went to O'Kelley's house across the street to watch the fire," *Stinski, supra*.[2]

Dr. Keith Lehman, who was the medical examiner, performed the autopsies on both Susan and Kimberly. D10-7:90, 93, 126. Dr. Lehman concluded that Susan was dead by the times the fires were set and her cause of death was stab wounds and possibly blunt force injury to the head. *Id.* at 124-25. Dr. Lehman opined

---

[2] In addition to murdering Susan and Kimberly, Stinski confessed that he and O'Kelley broke into numerous vehicles in the neighborhood. *Stinski, supra* at 41. The State presented a number of witnesses who testified that their vehicles had been broken into and items had been stolen. D10-7:145-65. The evidence proved that the break-ins occurred after the murder because the witnesses testified that they had parked their vehicles at their residence on the evening of April 11, and they discovered the break-ins on April 12. *Id.* at 146-47, 154-55, 159-60, 162-63.

that Kimberly was alive at the time of the fire and concluded that Kimberly's death was the result of carbon monoxide poisoning due to smoke inhalation. *Id.* at 129.

### B. Proceedings Below

#### 1. Trial Proceedings

On June 5, 2002, Stinski was indicted by a Chatham County grand jury for "two counts of malice murder, two counts of burglary, two counts of arson in the first degree, five counts of entering an automobile, one count of cruelty to children in the first degree, and one count of possession of a controlled substance with intent to distribute." *Stinski*, 286 Ga. at 839 n. 1. The State filed a notice of intent to seek the death penalty on June 17, 2002. *Id.*

Stinski's co-defendant O'Kelley was also indicted on June 5, 2002, for the same crimes, and the "State filed written notice of its intent to seek the death penalty on June 17, 2002"—the same day as Stinski. *O'Kelley v. State*, 284 Ga. 758, 758 n.* (2008). "[O]n October 21, 2005, [] the jury convicted [O'Kelley] on all counts as charged except as to the count of possession of a controlled substance with intent to distribute …The jury recommended death sentences for the murders on November 8, 2005." *Id.*

Nearly two years later, Stinski's trial began on May 24, 2007 and on June 8, 2007, "the jury convicted Stinski on all 13 counts that had been charged in the indictment and on lesser-included counts of felony murder." *Id.*

a.   Sentencing Phase Preparation

Stinski was "represented at trial by three experienced criminal defense attorneys, Michael Schiavone, Steve Sparger and Willie Yancey, Jr." D8-10:2; D25-24; D27-20:88. Trial counsel's trial strategy involved "front-loading mitigation evidence to '[a]cclimate the jury to it ahead of time' and to inform the jury of 'what was coming and to have the two phases complement each other.'" D13-16:45-49; D23-4:285-86; D27-20:12. Additionally, trial counsel's guilt phase strategy included the presentation of evidence "to create reasonable doubt and establish that" O'Kelley was "more culpable." D13-15:65; D13-16:26, 193-94; D23-4:260, 263-64; D23-5:75-77; D27-20:12-13. In support of their theory that Stinski was less culpable than O'Kelley, trial counsel wanted to show the jury that Stinski "lacked an understanding of what was going on at the time of the crime due to his age and immaturity" and that he was under O'Kelley's influence. D13-15:171; D13-16:195-96; D23-4:289-90; D23-5:158; D27-20:29. Trial counsel also decided to present evidence of Stinski's troubled background and

6

mental health issues during the sentencing phase—coupled with his less culpable argument—in an attempt to persuade the jury to spare his life.  D13-15:201-03; D13-16:195-96; D23-4:289-90; D23-5:13-17; D27-20:29.

Trial counsel hired experienced mitigation specialist Dale Davis to investigate Stinski's social history. D24-10:208-21; D24-12:70; D27-20:30.  Davis had "'worked on more than thirty (30) death penalty cases at both the trial level and post-conviction level in State courts as well as federal and military courts' and had received extensive training in areas relevant to her role as a mitigation specialist."  D24-10:220, 290; D27-20:30.  Davis' billing records showed that she spent "approximately 432 hours on [Stinski's] case, and her billings totaled about twenty-one thousand dollars."  D26-17:9-21; D27-20:31.

Davis had numerous meetings with Stinski and "obtained extensive information regarding his background."  D24-2:87-98, 248-57, 259-80; D24-3:34-36, 50-56; D26-11:252-89; D26-17:10-16; D27-20:33.  Davis also interviewed forty potential mitigation witnesses, which included family members, friends, teachers and mental health professionals who lived in Georgia, South Carolina, Florida, and Wisconsin.  D13-19:62-64; D24-8:188-89; D27-20:33. Following each interview, Davis prepared a memorandum that

was provided to trial counsel, which documented the extensive information she received regarding Stinski's background.  D13-16:13; D13-19:27-28, 68-69; D24-2:34-76, 99-139, 155-58, 163-78, 184-210, 212-18, 232-35, 237, 297-99; D24-3:16-19, 72; D24-8:162, 164, 168, 172, 194, 196; D26-17:145-86; D27-20:33.  Davis prepared a mitigation notebook that contained all of the records that she received during the investigation, which she provided to trial counsel.  D13-19:76-90, 101-02; D23-23:219-99; D23-24; D24-1:2-256; D26-9:22-299; D26-10:2-11; D26-10:2-11.

The records gathered by the defense team included medical, mental health, school, social services, criminal, civil, and military records about Stinski and his immediate family.  D23-23:219-299; D23-24; D24-1:2-256; D24-4:12-122; D26-12:185-298; D26-13; D26-14:2-70.

Trial counsel also hired psychologist Dr. Jane Weilenman.  D24-11:59-60, 71-72, 78-79; D27-20:35.  Dr. Weilenman was an experienced forensic psychologist who had previously worked on two Georgia death penalty cases and had worked for the Department of Juvenile Justice.  D23-4:256; D24-11:40-58; D24-12:72; D26-19:131; D27-20:35.

According to her report, Dr. Weilenman was asked by trial counsel to conduct a psychological evaluation of Stinski to

determine his current mental health status and social history. D26-19:150; D27-20:36. Trial counsel explained to Dr. Weilenman that they did not want her to perform "any psychological testing or evaluations until we have gathered as much background information as possible, so that we will better know what type of mental health (including mental retardation) issues may need to be examined." D25-23:242; D26-19:141.

Trial counsel provided Dr. Weilenman with the following documents that had been prepared or collected by Davis: "medical, school, counseling, and jail records; a genogram; memorandum regarding possible mitigation witnesses; client background information sheet; narrative chronology of life history; the rule book; memorandum describing the family situation in which [Stinski] lived; memorandum regarding expected mitigation testimony; and, memoranda detailing the information received during witness interviews." D23-21:258-99; D23-22:8-23, 27-59, 61-67; D26-17:252; D26-19:142, 150; D27-20:36. Trial counsel also provided Dr. Weilenman with both of Stinski's statements to the police and his jailhouse statement to a fellow inmate. D23-22:68-89; D26-19:144-45; D27-20:36.

Along with reviewing documents, Dr. Weilenman met with Stinski five times. D26-19:154-55; D27-20:36. Dr. Weilenman

"submitted written questions to [Stinski] seeking additional information, and [Stinski] provided a written response to her questions." D23-21:128, 130-35; D27-20:36. Additionally, Dr. Weilenman conducted interviews of numerous mitigation witnesses and had several consultations with trial counsel and Davis. D13-15:197; D23-21:154-63; D24-10:13, 20, 38, 40, 47; D24-11:76; D26-19:150, 155; D27-20:36.

Following her evaluation, Dr. Weilenman opined that Stinski exhibited at the time of the crime a "pattern of poor insight, immaturity of judgment and decision-making skills" due to his age and developmental stage. D26-19:151; D27-20:36-37. Dr. Weilenman also found that Stinski "valued peer approval, demonstrated limited ability to restrain impulses and did not consider an alternative course of actions" and was "functioning below the operational standard levels for adolescents." D26-19:151-52; D27-20:37. Dr. Weilenman also noted that it was reported at the time of his incarceration that Stinski was "easily led and manipulated, but has changed substantially and matured." D26-19:152. According to jail records, Stinski experienced "flashbacks and emotional outburst related to the crimes, has expressed guilt as well as remorse and is currently diagnosed with Post Traumatic Stress Disorder in remission." *Id.*

10

Dr. Weilenman's report did not suggest further evaluation or testing was needed.

b.    Sentencing Phase Presentation

In total, trial counsel presented 26 witnesses and copious background records to describe Stinski's background and mental health.

*(1)  Opening Statement*

Trial counsel informed the jury that Stinski's childhood was characterized by frequent moves, neglect, abandonment, violence, and alcoholism.  D10-9:7-12, 14.  In addition, Stinski was diagnosed with depression and attention-deficit/hyperactivity disorder (ADHD) as a child.  *Id.* at 12.  Counsel explained that during the period leading up to the crime, Stinski was essentially homeless and simply wanted to find people who liked him.  *Id.* at 13-16.  Trial counsel emphasized to the jury that they were not trying to minimize the tragedy, but wanted to show that Stinski deserved a sentence less than death.  *Id.* at 10-11, 16-17.

*(2) Presentation*

The mitigation witnesses fell into two categories: background witnesses and witnesses regarding O'Kelley.[3]  The background witnesses included: Stinski's maternal grandmother; Stinski's biological father; Stinski's stepmother; Stinski's biological mother; Stinski's biological mother; Stinski's step-aunt; Stinski's Wisconsin family pastor; Stinski's Wisconsin social worker; Stinski's Wisconsin psychiatric nurse; three Wisconsin schoolmates; Stinski's eighth grade teacher; Stinski's sixth grade teacher; Stinski's sister-in-law; three members of a family Stinski lived with after leaving his mother's home; a former co-worker; a friend from Windsor Forest High School; the mother of the friend from Windsor Forest High School; Stinski's ex-girlfriend, and mother of his child; Stinski's ex-girlfriend's mother; mitigation specialist Davis; and Dr. Weilenman.

---

[3] Regarding O'Kelley, trial counsel presented the testimony of two witnesses, William Albertson and Elaine Glenn, who taught O'Kelley during the late nineties.  D10-9:18-26; D27:20:43.  These witnesses testified that O'Kelley attended "Coastal Georgia Comprehensive Academy" which was a school for students with severe emotional and behavioral disorders, and they described O'Kelley as being similar to Charles Manson.  D10-9:18-19, 24-26; D27-20:43.

Because of the word limitation, the Warden cannot provide a full summary of the testimony presented at trial and will only address Dr. Weilenman's testimony as it is the relevant to Stinski's arguments on appeal.  That said, both the state habeas court and the district court summarized trial counsel's sentencing phase presentation.  *See* D27-20:43-67.  The state habeas court found that "the record is clear that trial counsel presented an extensive and detailed account of Petitioner's background at trial including the abuse and neglect he was subjected to; and provided an explanation to the jury for Petitioner's participation in the crime."  D27-20:82.

Dr. Weilenman testified about Stinski's background of neglect, abandonment, abuse, and his mental state at the time of the crimes.  D10-11:8-19, 31-57.  As to prior mental health diagnoses, Dr. Weilenman testified that Stinski was taken to a counselor while living in Wisconsin and was diagnosed with ADHD and placed on Ritalin.  D10-11:31; D27-20:62.  The counselor noted that Stinski struggled in school and should be tested for a learning disability, but he never was tested.  D10-11:33-34; D27-20:62.

Dr. Weilenman testified that "[d]uring the three month period after [Stinski] moved out of his brother's residence to the time of

the crime, [Stinski] lived in twelve different places." D10-11:46;
D27-20:64. Stinski did not have a driver's license, transportation
or money, and he just tried to find a place to sleep. D10-11:47;
D27-20:64. Stinski also lacked parental support and ended up
staying with friends. *Id.* At the time of the crime, Stinski lacked
the basic need of food and shelter. D10-11:60-61; D27-20:64.
Stinski "reported that he was only eating one meal a day at that
time and was going from house to house." D10-11:61; D27-20:64.

As to the crime, Dr. Weilenman testified that Stinski "was in
a situation and, based on his personality as well, the follower, that
he did what he did at that time, listening to this guy, as a follower,
rather than -- and not questioning it. He needed to fit in with that
group." D10-11:61; D27-20:64-65.

In describing Stinski, Dr. Weilenman testified that he was a
"soft-hearted" individual who wanted to be accepted, and he was a
socially immature person who tried hard to fit in with others.
D10-11:52; D27-20:66. Dr. Weilenman also testified that Stinski
had "low self-esteem, low self-image," and was a follower who
wanted to please others. D10-11:52; D27-20:66. Dr. Weilenman
testified that "[Stinski's] friends described him as a chameleon in
that 'he was whatever you wanted him to be,' and he 'would do
whatever it took to please you, to get you to like him.'" D10-11:57;

D27-20:66.  Additionally, Dr. Weilenman testified that "individuals like [Stinski] sometimes exhibit inappropriate conduct or behavior in that '[t]hey don't really think. It's just what can I do to please that person.'"  D10-11:52; D27-20:67.

Dr. Weilenman also explained that Stinski's ADHD was a lifelong condition that might improve with age:

> ADHD, one of the major issues is, *it has to do with executive functioning, and that's in your frontal lobes*, and typically frontal lobes may not be fully developed until you're at the age of twenty-five, so you could see an improvement in someone's ADHD.  They may have better control over their behavior as a mid twenties (sic) than they did when they were fourteen, so that's kind of a comparison.

D10-11:55 (emphasis added).  She expounded that the frontal lobes of the brain are your "thinking center" and house the brain's "executive functioning, how you think, how you process information, [and] impulse control."  D10-11:55; D27-20:67.

Regarding Stinski's diagnosis of adjustment disorder with depressed mood, Dr. Weilenman stated that he was placed on medication for depression for two years.  *Id.*  The jail records also showed that Stinski was diagnosed with PTSD, which she explained to the jury.  D10-11:54, 63-64; D27-20:67.

15

Dr. Weilenman also testified that in her initial meeting with Stinski in 2004, she felt like she was "interacting with a twelve year old" in that he was socially immature.  D10-11:58, 61; D27-20:68.  Dr. Weilenman explained that it was "the way he acted, his mannerisms, his social skills. He just seems so much younger. And again, I think that goes back to during that very strict period of his life when he wasn't figuring out who he was, it was almost stunted."  D10-11:58; D27-20:68.  By the late teenage years, one would expect a child to have developed "some sense of internalizing external values…a transformation from a parent telling you what to do to an internal sense of what you should be doing."  D10-11:59; D27-20:68.  In addition, the child should be "forming some sense of identity, who they are, absolutely know who they are, know what their belief systems are, know what they stand for, some sense of right and wrong."  *Id.*  Dr. Weilenman found that Stinski "really lacked that internal sense" due to his instability and abandonment issues.  D10-11:59-60; D27-20:68.  In addition, Dr. Weilenman testified that Stinski was still affected by peer pressure, which was unusual for his age.  D10-11:60.

Dr. Weilenman explained that at the time of trial, the evidence showed that Stinski had matured, and his physical appearance was different in that he had gained weight.  D10-

11:61-62.  Dr. Weilenman testified that Stinski's mannerisms had
also changed, and Stinski had earned his GED.  *Id.* at 62.
Although Stinski had matured, Dr. Weilenman testified that he
still seemed immature for his age.  *Id*.

### (3)   Closing Argument

Trial counsel argued that the evidence presented during the
sentencing phase showed that Stinski was the product of his
upbringing.  D10-11:162; D27-20:68.  Trial counsel argued that
Stinski never received help from his biological parents, and he
was subjected to rigid rules from his stepmother.  D10-11:163-64;
D27-20:68.  This rigid life resulted in Stinski entering adolescence
without having the chance to think for himself.  D10-11:164; D27-
20:68.  Trial counsel argued that Stinski was immature and never
had the "chance to think, to learn, to develop logic skills," and he
was ill-equipped to live on his own.  D10-11:165; D27-20:68-69.

Trial counsel also argued that O'Kelley was very
manipulative and "likened to Charles Manson."  D10-11:166; D27-
20:69.  And trial counsel noted that Stinski had only known
O'Kelley for eleven days.  D10-11:166; D27-20:69.  In comparison,
Stinski had a good heart and was not a heartless killer like
O'Kelley.  D10-11:140, 167; D27-20:69.  Trial counsel further

stressed that Stinski was a "young boy, eighteen." D10-11:140; D27-20:69.

Trial counsel acknowledged that the crimes were horrendous and devastating to the victims' family, and assured the jury that Stinski would be punished for his role in the crimes. D10-11:140-41; D27-20:69. Trial counsel asked the jury for fairness and mercy when making the determination of sentence. D10-11:146, 167-68; D27-20:69. Trial counsel repeatedly urged the jury to sentence Stinski to life without parole. D10-11:139-40, 162, 168, 173; D27-20:69.

The jury recommended death, finding nine statutory aggravating circumstances. D8-1: 210-13. Following the jury's recommendation of a death sentence, the trial court sentenced Stinski to death.[4] D8-1:210-15.

---

[4] Stinski was also sentenced to twenty years for each count of burglary, twenty years for cruelty to children, twenty years for each count of first degree arson, five years for each count of entering an automobile and fifteen years for possession of a controlled substance with intent to distribute, all to be served consecutively. *Id.* at 214-15.

### 2.    Motion for New Trial Proceedings

Stinski filed a motion, and amendments, for new trial in 2007 and 2008.  D8-1: 219-21, 235-49; D8-6: 2-273.  After holding a hearing, the trial court denied Stinski's amended motion for new trial in April 2009.  D8-6:309-54; D10-12.

### 3.    Direct Appeal Proceedings

In 2009, Stinski appealed his convictions and sentences to the Georgia Supreme Court, which the Court affirmed in 2010. *Stinski,* 286 Ga. at 839 n. 1.  The same year, the United States Supreme Court denied certiorari review.  *Stinski v. Georgia*, 562 U.S. 1011 (2010), *rehearing denied*, 562 U.S. 1173 (2011).

### 4.    State Habeas Proceedings

Stinski filed, and amended, his state habeas petition in 2011 and 2013.  D11-19; D12-24.  An evidentiary hearing was held in 2014.  D13-15 thru D26-25.  Stinski presented three mental health experts at his state habeas evidentiary hearing:  Dr. Joette James, Dr. Peter Ash, and Dr. James Garbarino.  Stinski argued that, unlike at trial, these experts offered more scientifically comprehensive testimony about Stinski's immaturity and impulsivity.

In 2017, the state habeas court denied relief.  D27-20.  The state habeas court issued a lengthy opinion and examined in

detail trial counsel's sentencing phase investigation and presentation. As for Dr. Weilenman, the court compared the evidence presented at trial and Stinski's new evidence and found trial counsel "were reasonable in retaining Dr. Weilenman and relying upon her findings, which did not include any recommendation of further testing." D27-20:38. The state court also found that Stinski failed to prove prejudice because his new mental health experts' testimony was "largely cumulative of that presented at trial and thus would not have created a reasonable probability of a different outcome." *Id.* at 81.

In 2017, Stinski applied for a certificate of probable cause to appeal the state habeas court's order in the Georgia Supreme Court, which was denied in 2018. D27-22; D27-24.

### 5. Federal Habeas Proceedings

Stinski filed his federal habeas petition in March 2018 and the Warden answered a month later. D1; D29. The district court dismissed Stinski's request for discovery as moot and later denied him an evidentiary hearing. D45; D56. After final merits briefing, D65; D69; D71, the district court denied Stinski relief and a certificate of appealability in December 2021, D72:79.

Stinski filed a motion to alter or amend the district court's final judgment arguing that there was a split among the circuits

regarding the application of sections 2254(d)(2) and 2254(e)(1).
D74:10.  Stinski asserted that the Third and the Ninth Circuits
had taken different approaches from that of the district court and
requested a COA "[g]iven the divergence of approaches in federal
appeals courts and the lack of resolution from the Supreme Court,
the correct application of these AEDPA provisions."  D74:11

The district court granted a COA on this request.  D75:25-31.
The court explained that it "applied both Section 2254(d)(2) and
Section 2254(e)(1)" and "examined whether the state habeas
court's decision was based on an unreasonable determination of
facts under Section 2254(d)(2), [], and presumed that individual
findings of fact made by the state habeas court were correct
absent clear and convincing evidence to the contrary[]."
*Id.* at 27.  The district court examined the differing approaches by
the different circuits and pointed out that "the Eleventh Circuit
has "note[d] that the plain language of [Section] 2254 does not
provide the basis" for the distinction drawn by the Ninth Circuit
(and seemingly the Third Circuit)."  *Id.* at 28 (quoting *Prevatte v.
French*, 547 F.3d 1300, 1304 n.1 (11th Cir. 2008)).  But the court
also noted that, at that time, this Court had yet to determine the
interplay of sections 2254(d)(2) and Section 2254(e)(1).  *Id.*
Consequently, "[t]he Court f[ound] that the split among circuit

21

courts—combined with the lack of a binding decision from the Eleventh Circuit—on the relationship between Section 2254(d)(2) and 2254(e)(1) [was]sufficient reason to amend its judgment and grant Petitioner a COA on this issue." *Id.* at 29-30.  The Court "grant[ed] Petitioner a COA on the issue of whether the Court properly applied Sections 2254(d)(2) and 2254(e)(1) of the AEDPA when evaluating the state habeas court's decision and factual determinations." *Id.* at 31.  The Court then narrowed this to "whether it was proper for the Court to apply Section 2254(d)(2)'s deference to the state habeas court's *decision* but apply Section 2254(e)(1)'s deference to the state habeas court's *individual findings of fact.  Id.* (emphasis added).

Stinski filed his brief in this Court on November 23, 2022. This response follows.

## C.  Standard of Review

This Court reviews "de novo a district court's denial of habeas relief on an ineffective-assistance-of-counsel claim, which presents a mixed question of law and fact."  *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

Contrary to Stinski's arguments, in *Pye*, this Court answered the open questions about the relationship between § 2254(d)(2) and § 2254(e)(1). *Pye* charted the course between the two subsections holding that *specific factfindings* fall under § 2254(e)(1) and *decisions* fall under § 2254(d)(2). This is precisely the path the district court followed. Stinski argues this is wrong because § 2254(e)(1) should only come into play when new facts have been presented in a federal habeas proceeding. But *Pye* resolved the question of the correct application of § 2254(e)(1), contrary to Stinski's argument.

The rest of Stinski's arguments concern the district court's review of his sentencing phase ineffective-assistance claim about his mental health. But the issue before the Court is whether the district court correctly determined and applied the interplay between § 2254(d)(2) and § 2254(e)(1). The remainder of his arguments are thus outside the scope of the COA.

Nevertheless, Stinski's other arguments fail. The district court correctly applied § 2254(e)(1) in determining the record supported the state court's factfinding crediting trial counsel's testimony that their mental health expert did not suggest further testing. Likewise, the district court correctly determined under

§ 2254(d)(2) that the record, as a whole, supported the state court decision that trial counsel's investigation was not deficient.  The district court also did not err under either § 2254(d)(2) or § 2254(e)(1) in determining the state court's "largely cumulative" factfinding about Stinski's new evidence and resulting lack of prejudice passed review.

## ARGUMENT

### I.  The district court applied § 2254(d)(2) and § 2254(e)(1) in a manner consistent with this Court's binding precedent.

Stinski asks this Court to define the interplay between 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) in a manner inconsistent with this Court's recent en banc decision in *Pye*, and its prior precedent.  Stinski argues, based on Ninth Circuit precedent, that § 2254(e)(1) only comes into play in federal habeas review when new facts are presented in federal habeas court.  Brief at 16-17.  But Pye has firmly shut the door on this interpretation.  *See Pye*, 50 F.4th at 1034-35, 1043-49.  This Court's recent decision in *Pye* sets forth the definitive relationship between § 2254(d)(2) and § 2254(e)(1), which is now binding in this circuit.  Because the district court's decision is in alignment with *Pye*, Stinski has failed to show he is entitled to relief.

24

## A. This Court defined the interplay between § 2254(d)(2) and § 2254(e)(1) in *Pye*.

Stinski argues that because § 2254(d)(2) and § 2254(e)(1) are independent clauses, § 2254(e)(1) cannot be "governed" by § 2254(d)(2).  Brief at 13.  Specifically, Stinski argues that a determination that all of a state court's factfindings satisfy § 2254(e)(1) should not preclude review of the facts under § 2254(d)(2).  To be clear, that these provisions are independent is not in dispute.  And this Court recognized this principle in *Pye* when it noted that "subsections (e)(1) and (d)(2) are 'independent requirements.'"  Pye, 50 F.4th at 1035 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)).

But that is how the district court applied them— independently.  The district court explained, in granting the COA, that it had "examined whether the state habeas court's *decision* was based on an unreasonable determination of facts under Section 2254(d)(2), [], and *presumed that individual findings of fact* made by the state habeas court were correct absent clear and convincing evidence to the contrary []."  D75:27 (emphasis added).  The district court's application of § 2254(d)(2) and § 2254(e)(1) conforms with this Court's binding decision in *Pye*, which explains the relationship between these two provisions.

25

Stinski states that the Court did not fully define the interplay
between § 2254(d)(2) and § 2254(e)(1) in *Pye*. In support, he
argues that *Pye* did not hold that "a petitioner must always show
by clear and convincing evidence that factual findings were
erroneous under section 2254(e)(1) as a prerequisite to
demonstrating that a 'decision' was 'based on' an 'unreasonable
determination of the facts' under section 2254(d)(2)." Brief at 12
(quoting § 2254(d)(2)). But the district court did not apply
§ 2254(d)(2) and § 2254(e)(1) in this manner, and Stinski did not
make this argument below. *See* D75:27; D74:12-13.

More to the point, and contrary to Stinski's argument, *Pye*
does fully define the interplay between § 2254(d)(2) and
§ 2254(e)(1). In *Pye*, the Court began by stating that "[b]efore
diving into the merits," the Court would "clarify three points about
AEDPA's standard of review," specifically how the federal courts
are to review state court factfindings. *Pye*, 50 F.4th at 1034. The
first two points answer the issue before this Court. First, the
Court explained that the "'lacked . . . fair support in the record'"
standard for reviewing state court factual findings was "'pre-
AEDPA law'" and no longer applied. *Id.* at 1034-35 (quoting *Rose
v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011)). Instead, the
Court held that "[u]nder the amended statute, a state court's

factual determinations are 'presumed to be correct,' and the petitioner has the burden of proving otherwise 'by clear and convincing evidence.'" *Id.* at 1035 (quoting § 2254(e)(1)).

Second, the Court held that "even if a petitioner successfully carries his burden under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2)." *Id.* The Court went on to explain that "[e]ven if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting § 2254(d)(2)). This is so because "[d]epending on the importance of the factual error to the state court's ultimate 'decision,' that decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination.'" *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224-25 (11th Cir. 2021) (Newsom, J., concurring)).

27

In the footnote to the second holding, the Court pointed out that "[t]he dissent vehemently objects to our explanation of the 'interplay' between §§ 2254(d)(2) and (e)(1)—not, to be clear, to the *merits* of our explanation, but to the fact that we have offered it at all." *Id.* at 1035 n.2 (emphasis in original). The Court agreed that it was "elaborating on the relationship between §§ 2254(d)(2) and (e)(1)," and was "explaining how two adjacent statutory provisions interact—in short, *how the law works*." *Id.* (emphasis in original). And the Court rejected the dissent's objection because "once 'an issue or claim is properly before the court'—as Pye's entitlement to relief under 28 U.S.C. § 2254 plainly is—'the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *Id.* (quoting *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991)).

The Court then analyzed in detail the state court's opinion rejecting Pye's ineffective-assistance claims applying these holdings. Taking each of Pye's attacks on the state court's opinion in turn, the Court looked first to the specific factfindings of the state court to determine whether it survived review under § 2254(e)(1). *See, e.g., id.* at 1043 ("While the court's determination that these affidavits contained inconsistencies

28

might have been debatable, it wasn't 'clear[ly] and convincing[ly]' erroneous.  28 U.S.C. § 2254(e)(1).").

The Court then determined whether the state court's *decision* on the overall point in contention was reasonable based on the record as a whole.  *See, e.g., id.* ("*Nor*—after giving effect to the presumptive correctness of the state court's assessment of the affidavits' inconsistencies, *see id.*—*was it unreasonable for the state court* to view the 'affidavit evidence alleging abuse and deprivation,' taken as a whole, 'with caution.' Doc. 20-40 at 66.") (emphasis added).  *See also, id.* at 1049-50 ("In doing so, the court discounted, to some extent, the affidavit testimony that it received, and factored in the competing evidence that Pye's family was generally uncooperative at the time of the trial, the tenuous connection between the mitigating evidence and Pye's crimes, and Pye's age when he committed those crimes.  None of these choices individually resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, *or was based on an unreasonable determination of the facts.*") (emphasis added).

The *Pye* decision provides a clear roadmap for examining a state court's factfindings and decisions under § 2254(d)(2) and

§ 2254(e)(1): specific state court *factfindings* are reviewed under
§ 2254(e)(1) and state court *decisions* are reviewed under
§ 2254(d)(2).  This holding, contrary to any implication by Stinski,
is congruous with *Miller-El,* which explains that "[t]he clear and
convincing evidence standard is found in § 2254(e)(1), but that
subsection pertains only to state-court determinations of factual
issues, rather than decisions."  *Miller-El v. Cockrell*, 537 U.S. 322,
341-42 (2003); *see also id.* at 348 ("To secure habeas relief,
petitioner must demonstrate that a state court's finding of the
absence of purposeful discrimination was incorrect by clear and
convincing evidence, 28 U.S.C. § 2254(e)(1), and that the
corresponding factual determination was 'objectively
unreasonable' in light of the record before the court.").

The district court's analysis conforms to the holdings in *Pye*,
and that should be the end of this appeal.

## B.  Stinski's interpretation of the interplay between § 2254(d)(2) and § 2254(e)(1) conflicts with *Pye*.

Based on a Ninth Circuit opinion, Stinski argues that
§ 2254(e)(1)'s "clear and convincing" standard only comes into play
when "'extrinsic evidence, i.e., evidence presented for the first
time in federal court[]'" is considered in determining whether a
state court's factfindings are correct.  Brief at 16 (quoting *Taylor*

*v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).  In contrast, Stinski asserts that § 2254(d)(2)'s "unreasonable determination" standard applies to "intrinsic challenges," which are presumably challenges based on facts that were before the state court.  Brief at 17.  This interpretation of § 2254(e)(1) has never been used by this Court and is contrary with the holdings in *Pye*.

As noted by the district court, "[t]he Ninth Circuit has held that Section 2254(d)(2) applies when a petitioner challenges the state court's findings based entirely on the state court record and that Section 2254(e)(1)'s presumption of correctness applies only when the habeas petitioner presents new evidence for the first time in federal court."[5] D75:28 (citing *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), overruled on other grounds by *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014)).  This Court has noted that "the Ninth Circuit has (alone) held that § 2254(e)(1)'s presumption applies only when a habeas petitioner presents new evidence in

---

[5] Also, correctly summarized by the district court, "[s]omewhat similar to the Ninth Circuit, the Third Circuit has held that Section 2254(e)(1) 'comes into play' when a habeas petitioner 'attack[s] specific factual determinations that were made by the state court[] and that are subsidiary to the ultimate decision'" and "a habeas petitioner 'may develop clear and convincing evidence by way of a hearing in federal court as long as he satisfies the necessary prerequisites.'"  D75:28 (quoting *Lambert v. Blackwell*, 387 F.3d 210, 235 (3d Cir. 2004)).

federal court." *Hayes*, 10 F.4th at 1223 (Newsom, J., concurring).
No other court appears to have done so.

Even so, no matter what other courts might have done, this
Court has now answered in *Pye* how § 2254(d)(2) and § 2254(e)(1)
work together—and specifically applied § 2254(e)(1) to facts only
presented in state court—so Stinski's argument is simply
foreclosed.

The basis for the certificate of appealability was, quite simply,
a question that the Court answered in *Pye*.  This Court should
affirm the decision below on that basis.

## II.   The district court's review of the state court's factfindings and decision about trial counsel's investigation of mental health evidence under § 2254(d)(2) and § 2254(e)(1) was correct.

As explained above, *Pye* should resolve this appeal.  Stinski
requested a COA on two issues, the first was whether the district
court's denial of his ineffectiveness claim for the sentencing phase,
on the whole, conflicted with decisions from other circuits.
D75:22-23; D74:11-12.  The second issue was whether the district
court applied an erroneous application of the interplay between
subsections (d)(2) and (e)(1).  D75:25-26; D74:10-11.  The district
court rejected the first request, D75:22-25, but granted a COA on
the second, *id.* at 25-31.  Specifically, the Court granted Stinski "a

32

COA on the issue of whether it was proper for the Court to apply Section 2254(d)(2)'s deference to the state habeas court's *decision* but apply Section 2254(e)(1)'s deference to the state habeas court's *individual findings of fact.*"  *Id.* at 31 (emphasis in original).  The question certified by the district court does not include within it, as Stinski now argues, whether the district court correctly reviewed the facts and state court decision, once the interplay between Sections 2254(d)(2) and 2254(e)(1) is settled (which it is, after *Pye*).

Except for one argument, Stinski's arguments about whether the district court correctly denied relief—on the basis that trial counsel supposedly unreasonably failed to adequately investigate his mental health to explain his conduct on the night of the crimes—is irrelevant because it goes beyond the question certified. *See Murray v. United States*, 145 F.3d 1249, 1250 (11th Cir. 1998) (explaining that the Court lacks jurisdiction to consider issues outside the scope of a COA on appeal).  Indeed, a fair reading of the first issue for which Stinski requested a COA, *see* D75:22-23; D74:11-12, would subsume these irrelevant arguments—meaning that the district court specifically denied him a COA on the issues he now argues.

33

Yet even if the Court were to address Stinski's improperly expansive arguments, they are meritless. Stinski argued in state habeas that trial counsel unreasonably failed to retain the proper mental health experts to conduct neuropsychological testing to explain the connection between Stinski's alleged mental health problems and life history with Stinski's conduct on the night of the crimes. The state court found that "counsel were reasonable in retaining Dr. Weilenman and relying upon her findings, which did not include any recommendation of further testing" and that Stinski had failed to prove counsel's mental health investigation was deficient. D27-20:39. The district court correctly decided under subsections (d)(2) and (e)(1) that the state court's deficiency determination withstood scrutiny.

## A. The state court did not make a cumulative finding about *Strickland's* deficiency prong.

Stinski appears to assert that the district court erred in reviewing the state habeas court's finding that his new mental health evidence was cumulative with respect to proving counsel's deficiency.[6] But the state habeas court did not find Stinski's new

---

[6] This Court has previously determined that a cumulative finding is one of fact. *See, e.g., Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1263 (11th Cir. 2012) (examining the state's

mental health evidence was cumulative in regard to its decision that trial counsel did not perform deficiently.  D27-20:39.  Instead, the court made this factfinding in deciding Stinski failed to show prejudice.  *Id.* ("[T]he court finds that Petitioner has failed to establish prejudice as Petitioner's state habeas evidence is substantially cumulative of Dr. Weilenman's testimony at trial."). More important for purposes of this appeal, the district court only addressed the state court's cumulative finding under *Strickland*'s prejudice prong.  *See* D72:21-27 (deficiency prong determination), 27-34 (prejudice prong determination).  Thus, Stinski's complaints of how the district court addressed this factfinding are irrelevant regarding the state court's deficiency prong determination.  The cumulative finding will be addressed below in Section III regarding the prejudice prong.

### B.  The district court properly applied § 2254(e)(1) in examining the state court's finding that trial counsel's mental health expert did not suggest further testing.

Stinski challenges the state court's finding that Dr. Weilenman did not recommend "further [mental health] testing."

---

"largely cumulative" finding under § 2254(d)(2)'s "unreasonable determination of the facts" standard).

D27-20:38.  The district court reviewed this finding under
§ 2254(e)(1), which Stinski argues was the incorrect standard
under his interpretation of the interplay between § 2254(d)(2) and
§ 2254(e)(1).  Stinski is incorrect, and the district court used the
correct standard as held in *Pye*.

### 1. Brief Procedural History

To set the backdrop, the state habeas court detailed the
investigation performed by trial counsel, D27-20:29-39, and
determined that "trial counsel conducted an exhaustive
investigation of Petitioner's background by interviewing
Petitioner, his family members, and friends; hiring a mental
health expert to evaluate Petitioner; and, gathering substantial
documentation of Petitioner's history," *id.* at 29.  The state habeas
court also detailed the extensive sentencing phase presentation
including the testimony of Stinski's mental health expert Dr.
Weilenman.  *Id.* at 39-69.

The state habeas court determined that trial counsel made a
reasonable strategic decision in choosing not to pursue further
mental health evaluation.  *Id.* at 38.  The state court found that
"Dr. Weilenman had significant experience in criminal matters, []
specifically in death penalty cases" and her "qualifications
included, 'a BA and master's in social psychology, a master's in

clinical psychology, [and] a Ph.D. in clinical psychology.'" D27-20:37-38 (citing and quoting D23-4:256; D24-11;40-58; D24-12:72; D26-19:131). The court also found that "Dr. Weilenman reported to counsel a detailed summary of the neglect, abuse, rejection and abandonment from Petitioner's childhood and discussed the 'overly controlling and punitive living environment'" and that Stinski "suffered from 'ADHD, Depression, unresolved grief issues/anger, and an undiagnosed Learning Disability.'" *Id.* at 38 (citing and quoting D26-19:150-51). The court concluded that "trial counsel were reasonable in retaining Dr. Weilenman and relying upon her findings, which did not include any recommendation of further testing." *Id.* at 38 (citing D13-15:100-01; D13-16:89).

The district court examined the state court's finding that Dr. Weilenman did not recommend further testing and found it was directly supported by Sparger's testimony at the state habeas evidentiary hearing. D72:25. The district court noted the following testimony from Sparger:

> If I had been told that testing was needed and it wasn't testing that [Dr. Weilenman] was going to perform, I would have said, "Well, who do we need?" and then it would have been getting the motion, getting the funds to go to the next person. And that never happened because

> I was never told . . . by Dr. Weilenman, by Ms. Davis, or
> anyone that there was testing [that needed to be done].

D13-16:89; D72:25.  The district court also noted that "Schiavone

testified that he could not recall whether Mr. Weilenman informed

him that Petitioner 'needed to have testing done.'"  D72:25

(quoting D13-15:100-01).  Based on trial counsel's extensive

investigation and Sparger's testimony, the district court

determined that the state court "reasonably concluded that

Petitioner's trial counsel acted reasonably in not retaining

additional experts."  *Id.* at 25-26.

The district court then examined Stinski's argument that the

state habeas court's decision was not supported by the record.  As

correctly summarized by the district court, in support of his

argument Stinski only "highlight[ed] Davis's testimony asserting

that she raised the need for a neuropsychological exam, a single

page from Dr. Weilenman's notes that shows a list of purported

experts and scientific literature, and trial counsel's impression

that Petitioner 'seemed young for his age.'"  D72:26.  The district

court found that this "evidence, at best, reveals contradictory

evidence regarding whether Dr. Weilenman and Sparger

discussed the need to retain additional experts to perform testing

on Petitioner that Dr. Weilenman could not perform herself."  *Id.*

(citing D65:95; D71:25–26).  The district court concluded that "[s]uch contradictory testimony is not enough to overcome the 'presumption of correctness' afforded to a 'factual determination made by a state court' under the AEDPA, which requires 'clear and convincing evidence.'"  *Id.* (quoting *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011)).

> ### 2. Under *Pye*, the district court correctly applied the § 2254(e)(1) standard to the individual state court factfinding at issue.  Alternatively, Stinski's attack on the state court's factfinding under § 2254(d)(2) also fails.

Stinski argues that the district court was not allowed to apply the § 2254(e)(1) standard because he "presented no new evidence to the district court that would have warranted application of the clear and convincing burden of proof in section 2254(e)(1)."  Brief at 18.  But as explained above, that argument is a non-starter after *Pye*.  *See, e.g., Pye*, 50 F.4th 1025, 1043-46, 1050-54 (examining the state court's factfindings under § 2254(e)(1) where there were no new facts presented in federal court); *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1259 (11th Cir. 2013) (examining the state court's "credibility determinations" based only on the facts before the state court under the § 2254(e)(1) standard).

The district court's determination is also not wrong under the
§ 2254(e)(1) standard.  Stinski does not address the correctness of
the district court's § 2254(e)(1), but instead argues the state
court's finding that Dr. Weilenman did not suggest further testing
was based on an unreasonable determination of the facts.
Stinski's argument conflicts with this Court's decision in *Pye*
which *requires* § 2254(e)(1) review of this factfinding.  Moreover,
even if the state court's factfinding were reviewed under
§ 2254(d)(2), as argued by Stinski, it would still stand.

The state habeas court credited trial counsel's testimony that
Weilenman did not recommend "further testing" over Stinski's
arguments to the contrary.  D27-20:38.  "'Determining the
credibility of witnesses is the province and function of the state
courts, not a federal court engaging in habeas review.'"  *Raheem v.
GDCP Warden*, 995 F.3d 895, 929 (11th Cir. 2021) (quoting
*Consalvo*, 664 F.3d at 845).  And this Court has repeatedly held
that "'[i]n the absence of clear and convincing evidence, we have
no power on federal habeas review to revisit the state court's
credibility determinations.'"  *Jenkins v. Comm'r, Ala. Dep't of
Corr.*, 963 F.3d 1248, 1272 (11th Cir. 2020) (quoting *Bishop v.
Warden*, 726 F.3d 1243, 1259 (11th Cir. 2013)).  The district court

did not err in determining that Stinski did not make the necessary showing to refute the state court's credibility finding.

Stinski did not present any testimony or evidence from Dr. Weilenman that she suggested to counsel that further evaluation was necessary.  Instead, Stinski relied primarily on the testimony of Davis—the mitigation specialist, not the mental health expert—that she recalled, years after the fact, that there was a conversation at a meeting which included counsel, Davis, and Weilenman, two years before trial in 2005, about getting further psychological assistance.  But this testimony doesn't show that counsel was informed by Dr. Weilenman that further testing was needed or that counsel agreed that another mental health expert was needed.  Davis testified during the state habeas evidentiary hearing that *she* informed counsel at this meeting that "due to Darryl's maturity level and those sorts of things" that *she* "*believe[d]* …he needed to have a neuropsychological exam." D13-19:38 (emphasis added).  And she "*t[hought] everybody thought* that that's what should be done." *Id.* (emphasis added).  She also testified that "Weilenman was going to contact a neuropsychologist that she knew, and that was where it was left." *Id.* at 37.  Yet trial counsel did not testify that this was what they

recalled from this meeting or that *they decided* to pursue the avenue allegedly suggested by Davis.

Stinski also argues that "[s]ubstantial documentary evidence" shows that the defense team had a meeting in January 2005 in which "the defense team agreed that they should retain additional experts to conduct psychological testing." Brief at 28. The "substantial documentary evidence" consists of one page of an email exchange, D19-9:184, between counsel and Davis. Brief at 28-29. The email exchange occurred *before* the meeting and provides no evidence that the "defense team *agreed*" that an additional mental health expert was needed for further testing. D19-19:184 (emphasis added). Instead, there was an email from Davis to counsel suggesting they use a "specialist" in the field of "developmental issues" to explain "impulsiveness, lack of judgment[,] etc." *Id.* Counsel responded, in pertinent part:

> Darryl was just a few months shy of turning 19 (DOB: 06/21/83) when the crimes occurred (04/10/02). Thus, even if the Supreme Court sets 18 as the magic number, it will not directly benefit him.
>
> However, if they do set a specific number in Simmons, we can use that along with Adkins (can't execute a person who is mentally retarded), to argue that someone who is mentally under the age of 18 should not be executed.

> I am also going to share this with Terry, because I think his guy in Camdem County may have been under 18 at the times of the crime. I know he was not under the age 17, because 1 checked since that is Georgia's magic number.

*Id.* Counsel never stated in his email response that further evaluation was needed or that another expert needed to be hired. *Id.*

Stinski also contends that Sparger's state habeas testimony showed he "forgot the information" discussed at the January 2005 meeting. Brief at 30. He argues this refutes the district court's finding that "Sparger's testimony '[did] not conclusively show that he had an 'inability to recall' [a plan to retain an additional expert]' based on a standalone statement." *Id.* at 30 (quoting D75:14).[7] Again, Stinski is wrong.

The portion of the record Stinski relies on shows that Sparger reviewed notes that listed topics related to immaturity and the death penalty and Sparger was asked: "You don't recall Dr. Weilenman ever talking to you about that kind of evidence regarding brain development and youth mitigation?" D13-16:95. Sparger answered: "Not — I mean, it's like the seminar materials.

---

[7] Here, Stinski cites to the district court' order on his motion to alter or amend, D75, not the court's order denying habeas relief, D72.

It was stuff that we knew about, but I don't remember any specifics or more importantly take this to the next step, getting us —getting him tested for this to determine this because that's— that's what our case was missing, in my opinion." *Id.* Thus, contrary to Stinski's contention, Sparger did not testify that he "forgot" whether there was a discussion, he simply said he did "not remember" being told by Weilenman to obtain further evaluation. *Id.* Sparger also testified that at a later meeting held a few weeks before trial, "in passing" it was "mention[ed]" by either Dr. Weilenman or Davis that Stinski should be checked by a "neuropsychologist or neuropsychiatrist" which surprised Sparger because it was "*the first mention of it*." D13-15:158-59 (emphasis added). But according to Sparger, this topic of conversation was "quickly" over and the team was "talking about something else." *Id.* at 159. Thus, Stinski has failed to undermine or refute the district court's determination that "Sparger's testimony does not conclusively show that he had an inability to recall [] a plan" to obtain another mental health expert because there was never a plan and this issue was only mentioned "in passing" and not impressed upon counsel as necessary by Dr. Weilenman. D75:14.

Stinski also alleges the district court did not properly consider that the "defense team identified Dr. Jeffrey Arnett as a candidate

to fill th[e] role" for neuropsychological testing.  Brief at 19.
Again, Stinski's evidence requires leaps not found in the record,
relies solely on the testimony of Davis, and is directly refuted by
Sparger's testimony.  Specifically, Davis testified that Weilenman
informed her that she contacted Arnett, but Davis had to admit
that she did not know what Weilenman talked to Arnett about or
what decisions were made regarding Arnett.[8]  D13-19:113.  Dr.
Weilenman and Arnett could have concluded that further
evaluation and testing was unnecessary, which is why Sparger
testified that Dr. Weilenman never informed trial counsel that
further testing was needed.  Additionally, as shown above,
Sparger stated that when it was mentioned for the "first" time "in
passing" to have another mental health expert evaluate Stinski in
a meeting *several weeks* before trial.  D13-15:158-59.  Which
invites the question of how could trial counsel have identified
Arnett as another expert after the January 2005 meeting if the
first time counsel heard a suggestion of another expert was a few
weeks before trial in 2007.  D13-15:158-59; *see also Stinski v.*

---

[8] Stinski also points to notations in the files of names of other
mental health experts, including Arnett, but that is not clear and
convincing proof that Weilenman *informed* trial counsel that
further evaluation was needed.

*State*, 286 Ga. 839, 839 n.1.  Stinski has the burden to bear and he cannot show the state court's factfindings are wrong based on his own erroneous interpretation of the record.

The remaining evidence Stinski relies on to dispute the court's finding is counsel's testimony acknowledging Stinski's immaturity and wish that they'd had more evidence to present to explain Stinski's actions.  But neither of these pieces of evidence shows that Weilenman informed them that further evaluation was necessary.  Additionally, "because *Strickland*'s standard for deficient performance is an objective one, trial counsel's hindsight assessment of the adequacy of his penalty phase investigation is entitled to little, if any, weight."  *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1330 n.4 (11th Cir. 2013).

In a somewhat similar case, this Court refused to overturn a state court's credibility determination based on competing testimony.  In *Nejad v. AG, Ga.*, 830 F.3d 1280, 1293 (11th Cir. 2016), the state court credited one witness, a prosecutor, who swore "to one version of events," over that of two [other] witnesses swearing to the opposite, and three witnesses unable to recall one way or the other."  The Court determined that it could not "say the evidence overwhelmingly favored Nejad's position" despite the testimony of two witnesses in his favor.  *Id.*  Thus, the Court

concluded that Nejad had "not identified clear and convincing evidence that undercut[] the prosecutor's testimony," and the Court held it "must defer to the state court's decision to credit [the prosecutor's] version of events." *Id.* at 1293, 1294.

Likewise, here the state habeas court was faced with the sworn testimony of trial counsel that further testing was not suggested by Dr. Weilenman and another mental health expert was only mentioned "in passing" at a meeting only a few weeks before trial. On the other side of the equation is the testimony, and an email, from the mitigation specialist stating that she suggested another mental health expert was needed and she "thought" trial counsel and Dr. Weilenman agreed with her suggestion. That is simply not enough to show by "clear and convincing" evidence that the state habeas court wrongly credited the testimony of trial counsel that Dr. Weilenman did not suggest further testing, or that the district court erred under § 2254(e)(1).

Moreover, even if this Court were to evaluate the state court's finding that Dr. Weilenman did not suggest further testing under § 2254(d)(2), the state court's decision would still stand. All in all, Stinski attempts to poke holes in the state court's finding with weak evidence from trial counsel's mitigation specialist that she "thought" there had been an agreement to seek another expert

and Stinski's own slanted view of the record. But this is not enough to show that the state court's decision to credit trial counsel's testimony, along with *Strickland*'s presumption of effectiveness, is not supported by the record. Thus, the court's finding was not based on an unreasonable determination of the facts, and Stinski's attack on the state court's factfinding also fails under § 2254(d)(2).

### C. The district court correctly determined under § 2254(d)(2) that the state court's decision that counsel's investigation was reasonable.

The district court also evaluated the state court's ultimate decision that trial counsel's mental health investigation was not deficient under § 2254(d)(2). Specifically, the district court "conclude[d] that the state court *reasonably determined* that trial counsel's decision not to retain additional experts was supported by 'reasonable professional judgments.'" D72:26-27 (quoting *Strickland*, 466 U.S. at 690-91). Stinski does not argue that the district's decision on this point violated the interplay between § 2254(e)(1) and § 2254(d)(2), but instead he merely disagrees with the district court's application of § 2254(d)(2). Thus, all of Stinski's arguments attacking the state court's deficiency *decision*

are outside the scope of the COA, but even if that were not the case, they fail on their own terms.

Stinski argues that trial counsel "acted unreasonably when they failed to pursue 'persuasive' and 'compelling scientific evidence.'" Brief at 26. But the state habeas court correctly distinguished between his new mental health evidence (which might be "persuasive" and "compelling") and the efforts of trial counsel to *investigate* his mental health and their decision to rely on Dr. Weilenman. "Counsel almost always can do more, but the Constitution requires only that counsel act reasonably." *Putman v. Head*, 268 F.3d 1223, 1245 (11th Cir. 2001). And there is nothing unreasonable about the state court's decision that counsel could reasonably rely on an expert's analysis that further investigation was unnecessary.

Stinski also complains that trial counsel should have known to do more based on trial counsel's hindsight analysis of their case and that counsel knew he was immature and impulsive. But, counsel's hindsight criticisms are worth "little, if any weight." *Gissendaner*, 735 F.3d at 1330 n.4. Stinski's second argument that counsel should have known to get another expert based on their own concerns about Stinski's mental health is unreasonable given that the record supports the state court's finding that

49

counsel was not advised to obtain another expert. *See*, *e.g.*, *Darling v. Sec'y, Dep't of Corr.*, 619 F.3d 1279, 1284 (11th Cir. 2010) ("Nor could a reasonable jurist debate the conclusion that [the defendant's] attorneys were entitled to rely on the psychological evaluation performed by [their expert], which did not recommend that [the defendant] be further evaluated for brain damage."). Moreover, the defense team conducted an extensive background investigation and Stinski has not argued that there was some vital piece of information in his past that counsel failed to uncover. When the record is viewed as a whole, it does not support, much less compel, a holding that the state court's deficiency decision was based on an unreasonable determination of the facts.

In support of his attack on the district court's review of the state court opinion, Stinski repeatedly compares his case to that of *Jefferson v. GDCP Warden*, 941 F.3d 452 (11th Cir. 2019), but "*Jefferson* is distinguishable because it applied a stricter pre-AEDPA standard of review to the state court's decision." *Pye*, 50 F.4th at 1051 n.21. Additionally, unlike in this case, Jefferson's mental health expert provided a report to trial counsel stating "'[i]n my opinion it would be worthwhile to conduct neuropsychological evaluation of this individual to rule out an

50

organic etiology.'" *Id.* at 458. That is the opposite of the situation here, where trial counsel's mental health expert did *not* so recommend. *See* D13-16:89.

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). All of Stinski's attacks on the state court's deficiency prong decision ignore this basic principle. Additionally, his complaints ignore that "even if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (quoting *Titlow, supra* at 23-24). Here, the state court did not face facts that even remotely suggested "that counsel took an approach that no competent lawyer would have chosen." *Id.*

Stinski has not shown that the district court erred under § 2254(d)(2), given the record as whole, when it upheld the state court's decision that trial counsel's investigation was not deficient for relying on their chosen mental health expert. *See generally*, *Raheem v. GDCP Warden*, 995 F.3d 895, 920 (11th Cir. 2021) ("We have held that '[w]hen mental health is at issue, counsel does not

51

offer ineffective assistance when it later becomes apparent that an expert who would have testified more favorably than the expert who was actually called may have existed.'") (quoting *Barwick v. Sec'y, Fla. Dep't of Corr.*, 794 F.3d 1239, 1244 (11th Cir. 2015)).

### III. The district court correctly applied § 2254(d)(2) in examining the state court's prejudice determination.

Stinski again strays outside the scope of the COA in addressing the district court's review of the state court's *Strickland* prejudice prong determination. Stinski does not explain how the district court misapplied the interplay between § 2254(d)(2) and § 2254(e)(1), but instead argues: that the district court was wrong to determine the state court's cumulative finding was unreasonable; and that the *district court's* reweighing was in error. Brief at 33-49. Indeed, Stinski does not mention the interplay at all in this portion of his brief. *Id.* Even should Stinski's arguments be reviewed, the district court correctly held that Stinski is entitled to no relief under AEDPA.

### A. The district court properly examined the state court's "largely cumulative" finding.

The state habeas court found that Stinski's new mental health evidence was "largely cumulative" of the evidence presented at trial. D27-20:81. "Generally, 'evidence presented in

postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.'" *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 649 (11th Cir. 2016) (quoting *Tanzi v. Sec'y, Fla. Dep't of Corr.*, 772 F.3d 644, 660 (11th Cir. 2014)). "The Supreme Court has found evidence cumulative where it 'substantiate[s],' 'support[s],' or 'explain[s]' more general testimony provided at trial." *Dallas v. Warden*, 964 F.3d 1285, 1308 (11th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 200-01, 131 S. Ct. 1388 (2011)). And this Court has held that "'largely cumulative' means 'chiefly cumulative,' 'mostly cumulative,' or 'more cumulative than not.'" *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1259 (11th Cir. 2012) (quoting *Random House Webster's Unabridged Dictionary* 1084 (2d ed. 2001)).

As noted by the state habeas court, Stinski argued that "he ha[d] established prejudice for his sentencing phase ineffectiveness claims" because "counsel 'failed to 'connect the dots' and explain the connection between [Petitioner's] life history, his developmental deficits and his participation in the crime.'" D27-20:80 (quoting D27-8:83). The state court found, based on the

53

record as a whole, "that the information Petitioner faults trial counsel for not presenting is *largely cumulative* of that presented at trial." *Id.* at 81 (emphasis added).  The district court did not err in reviewing that finding.

Stinski presented three mental health experts at his state habeas evidentiary hearing:  Dr. Joette James, Dr. Peter Ash and Dr. James Gabarino.  As for Dr. James, the state habeas court found that "[s]imilar to the conclusion of Dr. Weilenman presented at trial and detailed above regarding Petitioner's limitations in executive functioning and impulse control, Dr. James's conclusions focused upon Petitioner's alleged weaknesses in executive functioning which "limit the ability to change or revise a plan of action." D27-20:81.  This finding is supported Dr. Weilenman's trial testimony.

Dr. Weilenman testified that Stinski was diagnosed with ADHD, which affected his "executive functioning" and frontal lobes.  D10-11:55.  Dr. Weilenman also explained that the frontal lobes make up the "thinking center" which has to do with "executive functioning," information processing and "impulse control." *Id.*  Additionally, Dr. Weilenman testified that Stinski was a "follower who did what he felt to please others. others. *Id.* at 52.  Dr. Weilenman's testimony was also supported by the

testimony of Stinski's family, friends, childhood counselor, and
Davis.  D10-9:121-22, 194, 213, 216, 233; D10-10:15-18, 70, 173,
194-97, 200, 207.

Regarding Dr. Ash, as found by the state habeas court, he
testified that Stinski was the developmental equivalent of a 13 to
15-year-old who was susceptible to peer pressure; that the period
before the crime was stressful for him; and that the violence was
out of character.  D27-20:81.  After detailing the evidence
presented at trial, the state court found: "[C]onsistent with [Dr.
Ash's] conclusions, Dr. Weilenman testified at trial regarding
Petitioner's social immaturity; and numerous witnesses, including
a social worker, testified as to Petitioner's non-violent nature and
cooperative manner."  *Id.* at 81.  Again, the state habeas court's
finding is supported by the record as the topic addressed by Dr.
Ash was extensively covered at trial through Stinski's family,
friends, teachers, social worker, and Dr. Weilenman.  D10-9:58-59,
213, 216, 219-20, 226, 233, 241-42; D10-10:21, 23, 45-46, 68-72, 78-
79, 82, 84-86, 91, 101-02, 107, 121, 137, 140-41, 148, 153, 160-61,
173; D10-11:52, 58-60.

Finally, regarding Dr. Garbarino, the state court correctly
found Stinski argued that "Dr. Garbarino could have testified that
the abuse and neglect Petitioner suffered during his childhood

cumulatively 'undermined [Petitioner's] development as a child, and then, as an adolescent impaired his ability to be a successful adolescent and move into adulthood successfully.'" D27-20:81 (quoting D27-8:33).  The state court found Dr. Garbarino's testimony was "consistent" with trial counsel's "sentencing phase strategy [] to demonstrate the abuse and neglect Petitioner was subjected to and its impact." *Id.*  The court also found Dr. Weilenman's testimony was largely consistent with Dr. Garbarino's findings about Petitioner's development." *Id.* at 81-82.  Finally, the court found it was well within the ability of jurors to discern that such pervasive abuse and neglect as presented at trial would have an effect upon Petitioner, particularly taken in conjunction with Dr. Weilenman's testimony." *Id.* at 82.  Once again, the record fully supports the state court's finding as evidence on these topics was exhaustively presented at trial.  D10-9:34-39, 41, 44-46, 54, 58-59, 63, 97, 105, 108-113, 122-23, 177, 180-83, 189, 194-95, 207-08, 219-20, 239; D10-10:8, 10, 12-13, 44-46, 65-66, 69-72, 83, 95, 135, 137-41, 153, 155-58, 160-63, 195-96, 201, 205-06; D10-11:8-9, 11-52.

The district court examined the testimony of Drs. Weilenman, Ash, Garbino, and James.  D72:29-30.  The court determined that while the testimony of Drs. Ash, Garbarino, and James was more

scientific, it was still just a "more detailed" version of Dr. Weilenman's testimony. *Id.* The district court explained that "the mitigating evidence Petitioner's trial counsel introduced sufficiently showed that Petitioner suffered from an abusive and unstable childhood, functioned at an age below his chronological age of eighteen when he committed his crimes, lacked executive functioning compared to similarly aged peers, and was uniquely susceptible to peer pressure." *Id.* at 31. The court concluded that "the testimonies of Drs. James, Ash, and Garbarino simply amplified these themes, albeit in a more detailed approach." *Id.*

Stinski disagrees with the state court's "largely cumulative" finding and argues that the evidence presented at trial was only a "predicate" to what his new mental health experts could provide and Dr. Weilenman, based on her state habeas testimony, was only there to provide a social history. Brief at 21. First, Dr. Weilenman provided more than a social history at trial otherwise she would have never needed to testify about Stinski's executive functioning and his mindset of being a "follower" at the time of the crime. *See, e.g.,* D10-11:55-61. Second, calling his new experts' testimony a "predicate" concedes that their testimony was part of the same "theme" that was presented at trial. *See Ledford*, 818 F.3d at 649.

Stinski also argues that the state court's findings that his new evidence was "compelling," "persuasive," and a different type of "scientific evidence" than presented at trial is "irreconcilably at odds" with the court's "largely cumulative" finding.  Brief at 22. Again, Stinski misperceives the definition of "largely cumulative" which is: that the new evidence merely "tells a *more detailed version* of the same story told at trial or provides *more or better examples* or *amplifies the themes* presented to the jury." *Ledford*, *supra*. (emphasis added).  In other words, "largely cumulative" is not a finding that the evidence presented at trial is as good as or the same as the new evidence, but is instead a finding that the new evidence covers the same topics as the evidence presented at trial.  Stinski's arguments fail to grasp this meaning, *see* Brief at 21-25, 39-46, and mostly compare the quality of his new experts' opinions to that of Dr. Weilenman's testimony.

Stinski also relies upon a three cases, two from other circuits, to question the state court's cumulative finding, but none are binding and all are easily distinguishable.  Starting with this circuit, Stinski repeatedly cites *Maples v. Comm'r, Ala. Dep't of Corr.*, 729 F. App'x 817, 827 (11th Cir. 2018).  But that case is "an unpublished, non-binding authority that is fully distinguishable because the deferential principles of AEDPA did not apply as the

state court based its factual conclusions on the wrong Rule 32 petition." *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1266 n.23 (11th Cir. 2022).  Therefore, it provides no guidance on whether the state court's "largely cumulative" finding is correct when AEDPA does apply.

Next, Stinski relies on a Ninth Circuit unpublished opinion, *Lopez v. AG for Nev.*, 845 F. App'x 549 (9th Cir. 2021).  In that case, "the only penalty-phase evidence counsel introduced was lay witness testimony about Lopez's family from his uncle.  *Id.* at 551. In post-conviction, it was revealed that at the time of trial there was a "readily available expert evidence opining that he could be capable of rehabilitation and drawing the key causal connections he asked the jury to find was not a reasonable strategic decision." *Id.* at 552.  The Court held that the state "unreasonably applied *Strickland* because it failed to consider the significant impact that [the mental health] expert psychological opinion could have had on the jury."  *Id.*  Thus, the Ninth Circuit found a § 2254(d)(1) error on the part of the state court, not a § 2254(d)(2) or § 2254(e)(1) error.  It is also questionable as to whether the Ninth Circuit even applied AEDPA review.  *See id.* at 554 (Ikuta, J., dissenting) (Rather than apply [the AEDPA] highly deferential standard of review, however, the panel majority has applied our

59

circuit's now-familiar de-novo-masquerading-as-deference approach.") (quotations omitted).

Finally, Stinski relies on a non-binding Tenth Circuit opinion, *Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012), which, like *Maples*, did not apply § 2254 deference to the portion of the state court opinion relevant to Stinski's claim. *See Hookman, supra* at 1204-05. Nor was there any "largely cumulative" finding by the state court and the evidence presented at Hookman's trial was described as: "sub-par in almost every relevant respect. Evidence of family and social history was sorely lacking; the mental-health evidence presented was inadequate and quite unsympathetic; and [trial counsel] not only failed to rebut the prosecution's case in aggravation but actually bolstered it by his own statements." *Id.* at 1203.

In examining a state court's cumulative finding, this Court has examined it under the § 2254(d)(2)'s reasonableness standard. *See, e.g., Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1158 (11th Cir. 2017) ("the Florida Supreme Court did not unreasonably conclude that Reaves' proposed additional evidence about his mental health and substance abuse was cumulative"). However, regardless of whether § 2254(d)(2) or § 2254(e)(1) applies, the district court did not err in refusing to set aside the

60

state court's "largely cumulative" finding.  Even assuming Stinski's new mental health expert testimony was better or more scientific than the mitigation evidence presented at trial, it does not change the fact that it was merely a more "detailed version of the same story told at trial." *Ledford,* 818 F. 3d. at 649.  Thus, the state court's decision survives under either standard, and Stinski has not shown the district court erred.

**B.  The district court properly examined the state court's prejudice decision.**

In deciding prejudice, the state habeas court also reweighed the totality of the mitigating and aggravating evidence.  The state court's reweighing decision relied on three facts: the "extensive mitigation presentation" of trial counsel; "the cumulative nature of the evidence proffered in state habeas proceedings by Petitioner; "and the extensive evidence in aggravation."  D27-20:84.  The district court examined the record, conducting its own reweighing, and found the state court's prejudice determination was not based on an unreasonable determination of the facts under § 2254(d)(2).  D72:33-34.  The district court did not err under AEDPA in making this decision.

Stinski argues that the district court failed to properly reweigh the aggravating and mitigating evidence and thus its (d)(2) determination is in error.  Brief at 9, 34.  But, the district court's reweighing of the evidence is not under AEDPA review, it's the state habeas court's reweighing decision that is under review. *See Whatley v. Warden*, 927 F.3d 1150, 1181 (11th Cir. 2019) (explaining that the district court had erred in reviewing de novo the state court's prejudice decision by conducting its own reweighing of the aggravating and mitigating evidence).

Moreover, Stinski's arguments are about the weight that he contends should be assigned to his mitigating and aggravating evidence.  This falls in the realm of a legal issue, not a factual one. While the factual underpinnings have to pass muster under § 2254(e)(1), the actual manner in which the reweighing is conducted is a § 2254(d)(1) question—i.e., what weight to assign the various facts is question falls under *Strickland.  See id.* at 1183 ("This picture of a hypothetical retrial shows that Petitioner did not overcome with clear and convincing evidence the presumption of correctness that applies to the Supreme Court of Georgia's findings of fact. *See* 28 U.S.C. § 2254(e)(1).  It also shows that the Supreme Court of Georgia did not unreasonably apply

62

*Strickland* in finding that Petitioner could not show *Strickland* prejudice.").

As to the state court's factfindings, other than disputing the cumulative finding, Stinski does not argue that the trial counsel did not give an "extensive mitigation presentation" or that there was not "extensive evidence in aggravation." D27-20:84. Indeed, he concedes that "'highly aggravating' evidence that favored the death penalty" was presented at trial. Brief at 46. Nor does he argue, even under the § 2254(d)(2) standard, that the district court erred in its review of these findings. Rather, he argues that the district "made little effort to balance" the aggravating and mitigating evidence. *Id.* In making this argument, he emphasizes the weight he believes should have been assigned to his mitigating evidence but again that is a *Strickland* legal question. *Id.* at 46-47.

At bottom, Stinski has not made any argument, other than his attack on the cumulative finding, that the district erred in applying either § 2254(d)(2) or § 2254(e)(1). Thus, this portion of his argument fails.

63

## CONCLUSION

For the reasons set out above, this Court should affirm the judgment of the district court.

Respectfully submitted.

/s/ *Sabrina D. Graham*
*Sabrina D. Graham*

Christopher M. Carr
*Attorney General of Georgia*

Beth A. Burton
*Deputy Attorney General*

Sabrina D. Graham
*Senior Assistant Attorney General*

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 694-7975
sgraham@law.ga.gov
*Counsel for Respondent-Appellee*

64

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,726 words as counted by the word-processing system used to prepare the document.

<u>/s/ *Sabrina D. Graham*</u>
Sabrina D. Graham

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2023, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Sabrina D. Graham*
Sabrina D. Graham